399 A.2d 88

COMMONWEALTH of Pennsylvania, Appellee,

v.

Regina STRONG, Appellant.

Supreme Court of Pennsylvania.

Argued Nov. 17, 1978.

Decided Jan. 24, 1979.

Reargument Denied March 30, 1979.

304

Leo H. Eschbach, Pottstown, Stewart J. Greenleaf, Asst. Dist. Atty., Morristown, for appellant.

Joan D. Lasensky, Asst. Dist. Atty., for appellee.

Before EAGEN, C. J., and NIX, MANDERINO and LAR-SEN, JJ.

## OPINION OF THE COURT

MANDERINO, Justice.

Appellant, Regina Strong, was indicted on charges of murder, voluntary manslaughter, and involuntary manslaughter as the result of the death of her two-year-old son. She was then tried before a judge and jury and found guilty of murder in the second degree pursuant to the Act of December 6, 1972, P.L. 1482, No. 334, § 1, 18 Pa.C.S.A. § 2502. (The crime would be murder in the third degree under the provisions of the Crimes Code presently in effect. Act of March 26, 1974, P.L. 213, No. 46, § 4 (18 Pa.C.S.A. § 2502, Supp.1978)). Post-verdict motions were denied by the court en banc, and sentence of five to ten years imprisonment was imposed. This direct appeal followed.

Appellant now contends, as she did before the court en banc, that the evidence presented at her trial was insufficient to sustain the jury's verdict of guilty of murder in the second degree.

The facts surrounding appellant's indictment and conviction, taken in the light most favorable to the prosecution as verdict winner, and those inferences which may reasonably

be drawn from these facts, are as follows. *See Commonwealth v. Love,* 248 Pa.Super. 387, 375 A.2d 151 (1977). In 1973, appellant and her three children took up residence with C. Alton Wade, at his house located in Chester County, Pennsylvania. According to one of the prosecution's witnesses, Wade was a "high strung" individual with an ulcer, who had a very "short temper." At least partially because of Wade's influence upon her, appellant began "disciplining" her children by using a restraining strap and horse crop. Wade also administered physical beatings ("discipline") to appellant's children using these instruments. The testimony indicates that both appellant and Wade had used these implements to discipline appellant's two-year old son Daniel on November 26, 28, and December 1, 1973. During the afternoon of December 1, 1973, appellant discovered Daniel playing on a fence outside their house. This fence was off-limits to appellant's children and Daniel had been told not to play there. Because of his disobedience, appellant took Daniel by the arm and "dragged" him into the house, through the kitchen, and into the bedroom shared by her and Wade. There, in Wade's presence, appellant began to "discipline" Daniel. She struck him with the horse crop several times on the buttocks and on the legs, arms, and hands. Wade said that appellant was not striking Daniel hard enough and that he would show her how to do it correctly. Appellant then gave the horse crop to Wade, who struck Daniel with it several additional times. At some point during this beating, Daniel fell to his back on the floor. Wade then raised his foot and "stomped" on Daniel's stomach. Daniel died the next day.

In order to establish the cause of Daniel's death, the prosecution presented the testimony of Dr. Halbert Fillinger, a forensic pathologist who performed the autopsy on the victim's body. Dr. Fillinger testified that, in his opinion, the force needed to cause the injuries which resulted in Daniel's death, could have been supplied by application of a foot to the stomach in a "stomping" manner as previously described.

Appellant does not dispute the prosecution's contention that her son's death resulted from criminal agency. The

crux of appellant's argument is that the evidence fails to establish beyond a reasonable doubt that appellant's conduct caused Daniel's death. Specifically, appellant argues that the evidence shows only that she administered beatings to Daniel using the horse crop and restraining strap, and that the injuries to Daniel's buttocks, legs, arms, and hands which resulted from her use of these instruments were not severe enough, in and of themselves, to cause death. Indeed, on cross-examination, Dr. Fillinger admitted that he could not state the degree to which these external injuries might have contributed to Daniel's death. Appellant's argument misses the mark, however, because the evidence establishes that Wade's action of "stomping" on Daniel's stomach, was a form of "discipline" that Wade had used on appellant's children previously, and that on December 1, 1973, appellant and Wade were acting together in administering the "discipline" that ultimately led to Daniel's death.

A person need not actually deliver the death dealing blow to be convicted of murder if that person's conduct is such as to make him or her legally accountable for the conduct of another. Complicity for the conduct of another is provided for in the Act of Dec. 6, 1972, P.L. 1482, No. 334, § 1, 18 P.C.S.A. § 306:

"(a) General rule.—A person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable, or both.

(b) Conduct of another.—A person is legally accountable for the conduct of another person when:

(1) acting with the kind of culpability that is sufficient for the commission of the offense, he causes an innocent or irresponsible person to engage in such conduct;

(2) he is made accountable for the conduct of such other person by this title or by the law defining the offense; or

(3) he is an accomplice of such other person in the commission of the offense.

(c) Accomplice defined.—A person is an accomplice of another person in the commission of an offense if:

(1) with the intent of promoting or facilitating the commission of the offense, he:

(i) . . ..

(ii) aids or agrees or attempts to aid such person in planning or committing it;  or

. . ."

■ The trial court charged the jury that the Crimes Code (quoted above) provided that it could find appellant guilty if it concluded beyond a reasonable doubt that she was Wade's accomplice at the time Wade "stomped" on Daniel.

C. Alton Wade was brought to trial on murder charges for his part in Daniel's death. During Wade's trial, appellant testified that on two or three occasions prior to December 1, 1973, Wade had, in her presence, "disciplined" one of her children by "stomping" or kicking them in the stomach while they were lying on their backs on the floor. The relevant portion of appellant's testimony, given at Wade's trial and introduced into evidence at appellant's trial, is as follows:

Q. . . . What did [Wade] use on him?

A. The horse crop.

Q. That is Exhibit C–3?

A. Yes.

Q. How many times did he use it on him?

A. No more than three times.

Q. Did you see what areas of the body were struck?

A. At first Danny was on his stomach. Then the last time he rolled over on his back.

Q. You said the first three times he was on his stomach?

A. The first two times. And then the last time he was on his back.

Q. What happened immediately after that?

A. I saw Mr. Wade raise his foot over Danny.

. . . . .

Q. What did you do?

A. I turned my head for about five seconds.

Q. . . . What was Mr. Wade wearing at the time?

A. He was barefoot.

Q. You say you turned your head a few seconds.

A. Yes.

Q. When Mr. Wade lifted his foot, where was his foot in relation to Danny?

A. Right below his navel.

Q. What happened? What did you hear or what did you observe?

A. Well, when I turned my head I heard a sound.

Q. Will you try as best you can to describe that sound for this jury?

A. It was either Danny gasping for air or expelling, I don't know which.

Q. Why did you turn your head in the middle of this?

A. Because I saw it happen before.

Q. When did you see it happen before?

A. About two or three weeks earlier.

Q. What time of the day did this happen, and who did it?

A. It was in the afternoon, and Mr. Wade did it.

Q. On which child was that done?

A. First it was Darren, then it was Danny.

Q. You have told us that you turned your head because you saw this happen before on an afternoon about two or three weeks prior to December 1.

A. Yes.

Q. Will you describe on that date what Mr. Wade did?

A. It was for disciplining Darren and Danny for some-place they weren't supposed to be at.

He first—it was Darren upstairs in a guest room. And I told him afterwards—I mentioned to him, that if he put too much force, or something like that, too much, he could hurt him by doing something like that, by stomping on their stomach.

Q. Why did you go along with this type of punishment?

A. For one reason: I trusted his judgment.

Q. Why did you do this?

A. I thought there was a man who knew what he was doing. At first—well, there was another reason that involved too.

Q. Will you tell that, please?

A. I took it as though when it came to disciplining he—

Q. Take your time

A. I—first, I took it that if I didn't start disciplining the boys the right way, that we might as well forget about the whole thing between us."

This testimony, taken together with the other evidence presented by the prosecution to show that the "discipline" administered to Daniel on December 1, 1973, was initiated by appellant and administered jointly by her and Wade, was sufficient to establish her complicity in the homicide beyond a reasonable doubt. The continuing course of conduct engaged in by appellant and Wade regarding the "discipline" of appellant's children was one which included, as a constituent part, the kind of physical abuse that ultimately resulted in Daniel's death. On December 1, 1973, appellant initiated the "discipline" by forcibly bringing Daniel into the bedroom and then, in concert with Wade, began to administer the "discipline" which she and Wade had used on past occasions. It is too late for appellant to now divorce herself from the specific act of "stomping" on Daniel's stomach. She should have done that before it occurred. By taking part in such conduct, it became as much her act as Wade's.

"When two join in the commission of an unjustifiable assault, which results fatally, both are guilty regardless of which one inflicts the mortal wound . . . ." *Commonwealth v. Micuso,* 273 Pa. 474, 117 A. 211 (1922). *See also, Commonwealth v. Townes,* 460 Pa. 709, 334 A.2d 599 (1975) (where defendant and three others accosted victim, words were exchanged, defendant and the others left only to return five minutes later, defendant confronted victim and, after scuffle, defendant and two companions walked toward

victim who attempted to pull knife but was shot by one of defendant's companions, the collusion evinced by the return and threatening approach by group as a unit made the illegal act of companion the act of all, justifying conviction of defendant of voluntary manslaughter), and *Commonwealth v. Bryant,* 461 Pa. 309, 336 A.2d 300 (1975) (one who participates in a crime is legally responsible not only for his or her personal acts but also for the acts of others committed in furtherance of the crime.) The evidence was therefore sufficient to sustain the jury's verdict of guilty of murder in the second degree.

Appellant also argues that her conviction may not be based on a conspiracy theory, and that the judgment of sentence must be reversed because the prosecution never charged her with conspiracy to commit murder in the second degree. We need not reach this issue. As previously noted in this opinion, the trial court instructed the jury that appellant could be found guilty as an accomplice. The court specifically stated that there was no charge of conspiracy involved in the case.

■ Appellant's next contention is that her conviction of murder in the second degree may not stand because Wade was convicted of the lesser crime of voluntary manslaughter. This argument, however, overlooks Section 306(g) of the Crimes Code (18 Pa.C.S.A. 306(g)), which states:

> "(g) Prosecution of accomplice only.—An accomplice may be convicted on proof of the commission of the offense and of his complicity therein, though the person claimed to have committed the offense has not been prosecuted or convicted or has been convicted of a different offense or degree of offense or has an immunity to prosecution or conviction or has been acquitted."

The fact that Wade was convicted of voluntary manslaughter, therefore, does not bar appellant's conviction for murder in the second degree.

■ Appellant raises several other issues which, it is urged, require the grant of a new trial. These issues include allegations (1) that the trial judge erroneously summarized

Dr. Fillinger's testimony to the jury; (2) that in his closing remarks to the jury, the prosecuting attorney erroneously referred to the so-called felony-murder rule even though it had no application to the case; (3) that the trial court erred in instructing the jury that it could draw an adverse inference from appellant's failure to call a potential witness; (4) that the court erred when, over defense objection, it allowed the prosecution to introduce into evidence at appellant's trial, testimony she had given at Wade's trial; (5) that the court erred in allowing the prosecution to introduce into evidence certain allegedly gruesome photographs of the deceased's body; (6) that appellant was prejudiced by certain irrelevant testimony regarding her incarceration, bail, Wade's previous trial, various other forms of "discipline" allegedly employed by appellant and Wade, and appellant's psychiatric treatment; and (7) that the trial court erred by failing to charge the jury with the points for charge submitted by appellant in the form submitted. Numbers 1, 2, and 3 above, have not been properly preserved for appellate review because, although raised in post-verdict motions, they were not objected to at trial. Number 4 above has not been properly preserved for appellate review because, although objected to at trial, it was not raised in appellant's written post-verdict motions. Numbers 5 and 6 above were neither objected to at trial, nor raised in post-verdict motions, and are therefore not properly preserved for appellate review.

As to Number 7, above, several points for charge presented by appellant were affirmed and read to the jury as submitted, others were read in modified form. When read in modified form, the modifications were editorial in nature and did not affect the substance of the requested charge. Still other points were affirmed but not read because they had already been covered elsewhere in the court's charge. Some others were refused and not read because they erroneously stated the applicable law, or because they were not relevant to the issues presented by this case. We have reviewed the trial court's rulings and detect no reversible error.

For these reasons, judgment of sentence is affirmed.

ROBERTS and POMEROY, JJ., did not participate in the consideration or decision of this case.

O'BRIEN, J., did not participate in the decision of this case.