J-A29016-16

2017 PA Super 141

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| JOHN LEWIS RUSH | |
| Appellant | No. 767 WDA 2015 |

Appeal from the Judgment of Sentence March 10, 2015
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-000290-2014

BEFORE:  DUBOW, J., MOULTON, J., and MUSMANNO, J.

OPINION BY MOULTON, J.:                    **FILED MAY 11, 2017**

John Lewis Rush appeals from the March 10, 2015 judgment of sentence entered in the Allegheny County Court of Common Pleas following his convictions of four counts of aggravated assault and one count each of disarming a law enforcement officer; torture of a police animal; cruelty to animals; resisting arrest; escape; possession of a weapon; and flight to avoid apprehension, trial, or punishment.[1]  We affirm.

The trial court set forth the following facts:

On January 28, 2014, [Allegheny County Sheriff's Office Deputy John Herb] was assigned to the fugitive squad, and was looking for . . . Rush.  [Rush] had a warrant out for his arrest for violating the conditions of his probation for a

---

[1] 18 Pa.C.S. §§ 2702(a)(3), 5104.1(a), 5511.2(b), 5511(a)(2.1)(i)(A), 5104, 5121(a), 907(b), and 5126(a), respectively.

prior conviction. Deputy Herb had received information that [Rush] was in the Lawrenceville section of Pittsburgh. Once Deputy Herb reached Butler Street in Lawrenceville, he observed an individual who roughly matched the description of [Rush]. That individual identified himself to the Deputy as "John" and, shortly thereafter, lunged at the Deputy's handgun. A physical struggle ensued. The Deputy successfully pushed away from "John" and once he had created some distance between them, the Deputy fired his taser which struck "John" but had no effect. Immediately thereafter, "John" charged the Deputy and multiple punches were exchanged. At the conclusion of the skirmish, "John" ran away from the Deputy. The Deputy pursued, yelling at "John" that he was under arrest. Deputy Herb eventually lost sight of "John". Deputy Herb radioed a report of the incident including the location. Approximately 40 minutes later, Deputy Herb, who was still searching for [Rush], became aware of a report of a suspicious male in a house at 3701 Butler Street.

. . .

Timothy McGill testified that he resided with his fiancée Stephanie Kerr at 3701 Butler Street, . . . on January 28, 2014. McGill testified that [he] awoke to a loud knock on his door. [Rush] asked McGill to let him into the apartment to use the bathroom. McGill refused and a heated argument ensued, which ended when McGill slammed the door in [Rush]'s face and locked him out. McGill dressed and went down to the laundry room, where he heard a noise, and upon further investigation discovered [Rush] inside, crouched down with his back against the wall. McGill testified that he became infuriated at that point. He said to [Rush] that he had no business being in the building. [Rush] jumped to his feet and McGill observed that [Rush] now had a knife in his left hand. McGill retreated and saw [Rush] flee down the steps but not out the front door. As the only other option from that location would be the basement, McGill assumed [Rush] had gone down the basement stairs. McGill exited the building, took a position from which he could watch the front door, called his fiancée, and told her to lock the door and call the police. Ten to fifteen minutes later, police officers arrived at the scene.

. . .

Officer [Daniel] Nowak yelled as loud as he could, three times, "Pittsburgh Police." "Give up. Surrender." He heard no response to any of the verbal commands. Sergeant Henderson decided to send a canine officer alone with his dog down to the basement. Officer Phillip Lerza arrived at the scene with Rocco, his police dog. Officer Lerza also yelled down to the basement three times[2] without any response. Officer Lerza and Rocco proceeded to the basement, followed by Officer Nowak and Officer Robert Scott. Officer Lerza requested that Officer[s] Nowak and Scott remain on the stairs while Officer Lerza and Rocco searched the room.

As Officer Lerza and Rocco approached the rear part of the basement, [Rush] jumped out from behind the right-hand side of a doorway. Officer Nowak observed [Rush] immediately start striking Rocco in a downward punching motion on his back. [Rush] struck Rocco from behind with both fists. As Officer Lerza moved toward [Rush] and Rocco, [Rush] disengaged with Rocco and struck Officer Lerza with both hands, fists closed. Officer Nowak yelled out and ran toward the melee. [Rush] stopped fighting Officer Lerza and charged Officer Nowak. The two collided at high speed. [Rush] swung wildly at Officer Nowak with both hands. Officer Nowak blocked punches with his left hand and struck [Rush] with the flashlight he held in his right hand. During the combat, Officer Nowak injured his finger and his ankle. Officer Nowak gained leverage, took [Rush] to the ground and got on top of him. [Rush] continued to fight, despite the Officer commanding him to

_____

[2] The first command that the Office[r] gave was "Pittsburg Police canine. Anyone in the building, sound off now, or I'll send in the dog." Next the Officer said, "Pittsburgh Police canine. Anyone in the building, sound off now, or I'll send in the dog and you will be bit." Lastly, he said, "Pittsburgh Police canine. Anyone in the building, sound off now, or I'll send in the dog."

1925(a) Opinion, 2/16/16, at 7 ("1925(a) Op.").

stop resisting. Officer Lerza grabbed [Rush]'s arms but could not get handcuffs on [Rush] due to [Rush]'s resistance.

Officer [John] Baker arrived to assist Officers Lerza and Nowak, but the three of them were still unable to handcuff [Rush].[3] A sheriff's deputy came down with his taser in dry stun mode. The Deputy tased [Rush] in the leg to no effect. Officer Nowak pulled [Rush]'s shirt over his head and instructed the Deputy to tase [Rush] on the uncovered skin. After three applications of the taser to [Rush]'s bare skin, [Rush] stopped fighting and the officers were able to handcuff [Rush]. Once [Rush] was restrained, Officer Nowak observed Officer Lerza pat Rocco and discover that Rocco was covered in blood. Officer Nowak saw a knife on the ground near [Rush] and observed Officer Lerza pick up Rocco and run upstairs.

. . .

Officer Lerza rushed Rocco to a local veterinary hospital. While Rocco was being examined, Officer Lerza noticed pain in his shoulder. Upon closer examination, he discovered that he had been stabbed through several layers of clothing.

. . .

Dr. Julie Compton, a Board-certified veterinary surgeon, testified as an expert in veterinary surgery. Dr. Compton testified that she worked at the Pittsburgh Veterinary Specialty and Emergency Center (PVSEC), and in that capacity became familiar with a dog named Rocco who had been stabbed. Initially, Dr. Compton testified that she was at home but was notified by her resident that Rocco was stabile [sic] with a laceration about three centimeters long.

_____

[3] Detective Thomas Ninehouser, who was also present at the scene "described [Rush]'s demeanor as '[C]razy, uncooperative, resisting.'" 1925(a) Op. at 9.

Forty-five minutes later, she received another call that Rocco's condition had worsened. Dr. Compton arrived and performed two surgeries. During the first surgery, she discovered that Rocco's left kidney had sustained irreversible damage. She also observed that his aorta and vena cava were stripped of all soft tissues and the external wound of three centimeters was approximately five inches long internally. Two days later she performed a second surgery. Rocco had liters of blood in his abdomen indicative of extensive internal hemorrhaging. Dr. Compton could not find the source of the bleeding. While attempting to find the source of the bleeding, Dr. Compton discovered that Rocco's spine had been fractured by the knife wound. She stated that "to shred a piece of bone off a dog's spine underneath inches of muscle would take a very large amount of force." Dr. Compton said that Commonwealth Exhibit 14, a pocket knife with the tip broken off, was consistent with the weapon that caused Rocco's injuries. She testified that the force required to break off the tip of the blade would be similar to the force required to injure the dog's spine. Further, she testified that the length of the blade would have been sufficient to cause Rocco's wounds, assuming the knife was fully inserted into the dog. Rocco died on January 30, 2014 from hemorrhaging resulting from a stab wound.

1925(a) Opinion, 2/16/16, at 3-4, 6-10 ("1925(a) Op.") (internal citations omitted).

On December 5, 2014, a jury found Rush guilty of the aforementioned crimes. On March 10, 2015, the trial court sentenced Rush to an aggregate term of 14 years and 10 months' to 36 years and 6 months' incarceration, followed by 8 years' probation.[4] Rush filed post-sentence motions, which

_____

[4] The trial court sentenced Rush to 30 to 84 months' incarceration for the conviction for disarming a law enforcement officer, 40 to 84 months' incarceration for the conviction for torture of a police animal, 36 to 90 months' incarceration for the aggravated assault conviction, 36 to 90

*(Footnote Continued Next Page)*

the trial court denied on April 16, 2015. On May 15, 2015, Rush timely filed a notice of appeal.

Rush raises the following issues on appeal:

> I. Did the trial court err and abuse its discretion by failing to disqualify a sitting juror who was openly weeping during trial testimony regarding the death of the canine, Rocco?
>
> II. Did the trial court err in failing to give the requested jury instruction for malice in relation to the Torture of a Police Animal charge as the standard jury instruction fails to define a necessary element?
>
> III. Was the sentence of 178 to 438 months of imprisonment, followed by 8 years of probation, manifestly excessive, unreasonable, and contrary to the dictates of the Sentencing Code, and thus an abuse of the sentencing court's discretion?

Rush's Br. at 7 (suggested answers omitted).

## I. Juror Disqualification

Rush claims that during testimony concerning the death of Rocco juror number six ("Juror No. 6") cried, which demonstrated bias and partiality. He further claims that the trial court did not question Juror No. 6 and that the instructions given to the jury at the conclusion of trial were insufficient to

---

*(Footnote Continued)* _____

months' incarceration for a second aggravated assault conviction, and 36 to 90 months' incarceration for a third aggravated assault conviction, to run consecutive to each other. The trial court further sentenced Rush to 2 years' probation for the resisting arrest conviction, 3 years' probation for the escape conviction, and 3 years' probation for the conviction for flight to avoid apprehension, trial, or punishment, to run consecutive to each other and to the term of incarceration.

address the incident. Finally, Rush argues his request to dismiss Juror No. 6 should have been granted.

Article I, section 9 of the Pennsylvania Constitution, as well as the Sixth Amendment to the United States Constitution, guarantees a defendant the right to an impartial jury. Pa. Const., art. I § 9; U.S. Const. amend. VI. "It is well settled that the purpose of *voir dire* is to ensure the empanelling of a fair and impartial jury capable of following the instructions of the trial court." *Commonwealth v. Lesko*, 15 A.3d 345, 412-13 (Pa. 2011). Our Supreme Court has explained that a juror is not expected "to be free from all prejudices[;] rather, the law requires them to be able to put aside their prejudices and determine guilt or innocence on the facts presented." *Commonwealth v. Smith*, 540 A.2d 246, 256 (Pa. 1988).

"The decision to discharge a juror is within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion." *Commonwealth v. Carter*, 643 A.2d 61, 70 (Pa. 1994). "This discretion exists **even after the jury has been [e]mpanelled and the juror sworn**." *Id.* (emphasis added). Our Supreme Court explained that "a finding regarding a venireman's impartiality 'is based upon determinations of demeanor and credibility that are peculiarly within a trial [court]'s province. . . . [Its] predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record.'" *Smith*, 540 A.2d at 256 (quoting *Wainwright v. Witt*, 469 U.S. 412, 428-29 (1985)). It is the appellant's burden to show that the jury was not

impartial. ***Commonwealth v. Noel***, 104 A.3d 1156, 1169 (Pa. 2014). Further, this Court has found that *per se* prejudice does not result where a juror becomes upset during the trial. ***See Commonwealth v. Pander***, 100 A.3d 626, 632 (Pa.Super. 2014) (*en banc*).

In ***Commonwealth v. Briggs***, our Supreme Court set forth the standard for prospective juror disqualification:

> The test for determining whether a prospective juror should be disqualified is whether he is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on the basis of answers to questions and demeanor. . . . It must be determined whether any biases or prejudices can be put aside on proper instruction of the court. . . . A challenge for cause should be granted when the prospective juror has such a close relationship, familial, financial, or situational, with the parties, counsel, victims, or witnesses that the court will presume a likelihood of prejudice or demonstrates a likelihood of prejudice by his or her conduct or answers to questions.

12 A.3d 291, 333 (Pa. 2011) (quoting ***Commonwealth v. Cox***, 983 A.2d 666, 682 (Pa. 2009)).

While most cases address the issue of prospective jurors, we have employed the same analysis in cases where a question arises about a juror's impartiality during trial. ***See Pander***, 100 A.3d at 632 ("While ***Hale*** and the cases discussed therein involved juror challenges prior to trial, we find the discussion therein apt . . . ."); ***Carter***, 643 A.2d at 70 ("Th[e trial court's] discretion exists even after the jury has been [e]mpanel[]ed and the juror sworn."). Here, there is no allegation that Juror No. 6 had a personal

relationship with any party, counsel, victim, or witness. Accordingly, we will not presume prejudice. *See Commonwealth v. Stewart*, 295 A.2d 303, 305-06 (Pa. 1972) (presuming prejudice where father of the victim was in the jury panel and had been in the same room with the rest of the jury for more than two days). Further, this is not a situation where prejudice will be presumed by the juror's conduct. *See Pander*, 100 A.3d at 632.

During Officer Lerza's cross-examination, Rush's counsel played a 911 tape in which Rocco was heard barking in the background. Upon hearing the recording, Officer Lerza cried on the witness stand and Juror No. 6 cried as well. Rush states that "[i]t is unclear whether the juror cried because of sadness over the dog being dead, or because of the police officer's emotional state, or perhaps because of memories of other dogs in the juror's past." Rush's Br. at 33. Nevertheless, Rush claims that the trial court should have dismissed Juror No. 6 because: her reaction was "an obvious sign of bias and an excessive emotional attachment to one side of the case, the prosecution"; she could not render a verdict solely on the law and facts of the case as her "emotions clouded her judgment"; and her emotional response could have influenced the rest of the jury. *Id.*

The trial court found that the juror cried "during extremely emotional testimony, during which the witness also cried" and that Rush failed to establish how the juror's crying "impeded the juror's ability to fulfill the oath

to judge the case based on the facts and not on emotion." 1925(a) Op. at 12. We agree with the trial court.

This Court addressed a similar situation in *Pander*, where a juror became visibly upset after viewing graphic photographs of the victim and required a break after viewing them. 100 A.3d at 631.[5] Upon questioning by the trial court, the juror stated that even though the photographs reminded her of her late husband, who had died the previous year, she could remain impartial. *Id.* The trial court denied appellant's request that an alternate juror be seated. *Id.* On appeal, the appellant argued that prejudice should have been presumed based on the juror's reaction. *Id.* We disagreed, concluding that a juror becoming upset over a photograph was not *per se* prejudicial. *Id.* at 632. We further stated "[T]hat the juror was disturbed by pictures of the victim because it brought back memories of her recently deceased husband does not alone indicate an inability to consider the evidence impartially." *Id.*

While in *Pander* the juror had to leave the courtroom, here, Juror No. 6's crying was barely noticed. During a break, while the jury was out of the courtroom, the following exchange occurred:

---

[5] In *Pander*, the appellant filed a petition under the Post Conviction Relief Act, claiming that his counsel had rendered ineffective assistance during trial. We concluded that the underlying ineffective assistance of counsel claim lacked merit.

[TRIAL COUNSEL]: It's been brought to my attention during the testimony Juror No. 6 was crying.

THE COURT: I believe Juror No. 6 was crying when you played the CD containing the radio between Rocco's K-9 partner and dispatch where the dog was heard in the background, so it was in response to hearing your evidence.

[TRIAL COUNSEL]: All right. Well, regardless of what triggered the emotional response, I questioned the potential jurors extensively as to whether they could decide this case based on the facts of evidence and not be swayed by passion, sympathy, emotion, et cetera. They all assured me that they could.

The fact that this [juror] succumbed to emotion causes me to question whether she can decide this case impartially, so I would ask that that juror be removed.

[COMMONWEALTH]: Your Honor, I would object to that. The juror took an oath. We have to have faith that she would follow the oath she took. And whatever effect to that juror or witnesses was in response to what [trial counsel] played on his own cross-examination of Officer Lerza.

THE COURT: I, in fact, cry at weddings and funerals of people I don't know, because I respond to other people's sorrow. So the fact that the officer cried on the stand may have triggered that, we don't know. But the law presumes that the jury will be able to follow the instructions given by the Court and she will be further instructed when I give my closing instruction that she must decide the case based on the evidence as it was presented and not be swayed by any bias, prejudice or emotion, so the motion is denied.

N.T., 12/11/14, at 505-06.

The juror's reaction in this case was much less conspicuous than in *Pander*, where the juror required a break and left the courtroom. Here, as trial counsel acknowledged, it had to be "brought to [his] attention" that the

- 11 -

juror was crying. *Id* at 505. Furthermore, trial counsel did not ask that the juror be questioned, and did not object when the trial court stated that it would further instruct the juror during "closing instructions that she must decide the case based on the evidence as it was presented and not be swayed by any bias, prejudice or emotion."[6] N.T., 12/11/14, at 506. Finally, Rush has offered nothing more than speculation about Juror No. 6's possible bias or influence on the rest of the jury. In short, he has failed to meet his burden to show that the jury was not impartial, *see Noel*, 104 A.3d at 1169, and the trial court did not abuse its discretion in declining to dismiss Juror No. 6.[7]

Rush also argues that the trial court's subsequent instructions were an insufficient response to Juror No. 6's emotional reaction. "It is settled law that, absent evidence to the contrary, the jury is presumed to have followed

---

[6] Rush does not contend that Juror No. 6 showed any bias either during pre-trial *voir dire* or at any time after the incident in question.

[7] Rush cites several cases from other jurisdictions that do not support his claim. *See State Farm Mut. Auto Ins. Co. v. Rindner*, 996 So. 2d 932, 935 (Fla. Dist. Ct. App. 2008) (no abuse of discretion in denying the motions for mistrial and new trial in personal injury case where plaintiff's mother cried during her testimony); *Washburn v. Holbrook*, 806 P.2d 702, 703-04 (Or. Ct. App. 1991) (no abuse of discretion in denying motion for mistrial in medical malpractice case where plaintiff, physician, and her attorney cried during the trial); *United States v. Fazio*, 770 F.3d 160, 169 (2d Cir. 2014) (no abuse of discretion in dismissing juror who "professed love for defense counsel [and] said that the government's counsel was corrupt half the time," and during trial smirked, exchanged knowing glances with another juror, and rolled her eyes).

the trial court's instructions . . . ." ***Commonwealth v. Laird***, 988 A.2d 618, 629 (Pa. 2010). During its charge to the jury, the trial court stated:

> You should consider these instructions as a whole. You may not pick out one instruction and disregard others. I caution you not to allow sympathy, prejudice or any emotion to influence you.
>
> It is your duty to base your decision strictly on the evidence. . . .
>
> . . .
>
> You must keep your deliberations free from any bias or prejudice. Both the Commonwealth and the Defendant have the right to expect you to consider the evidence and apply the law as I have outlined it.

N.T., 12/11/14, at 883, 908. When the trial court asked trial counsel whether he had any proposed additions or corrections, counsel said nothing about the juror incident. Thus, Rush has waived his claim that the trial court's instructions were insufficient. ***See*** Pa.R.Crim.P. 647(c) ("No portions of the charge nor omissions from the charge may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate.").

## II. Jury Instructions

Rush next argues that the trial court abused its discretion in failing to give his requested jury instruction on the definition of "maliciously." Rush contends that the offenses of cruelty to animals and torture to a police animal required him to have acted "willfully or maliciously," and while the

- 13 -

trial court's instructions defined "willfully," they did not define "maliciously." Rush's Br. at 41.

We review a challenge to a jury instruction for an abuse of discretion or an error of law. *Commonwealth v. Brown*, 911 A.2d 576, 582-83 (Pa.Super. 2006). We must consider the charge as a whole, rather than isolated fragments. *See Lesko*, 15 A.3d at 397; *Commonwealth v. Simpson*, 66 A.3d 253, 274 (Pa. 2013). We examine the entire instruction "against the background of all evidence presented, to determine whether error was committed." *Commonwealth v. Grimes*, 982 A.2d 559, 564 (Pa.Super. 2009) (quoting *Buckley v. Exodus Transit & Storage Corp.*, 744 A.2d 298, 305 (Pa.Super. 1999)). "A jury charge is erroneous if the charge as a whole is inadequate, unclear, or has a tendency to mislead or confuse the jury rather than clarify a material issue." *Id.* (quoting *Buckley*, 744 A.2d at 305). "Therefore, a charge will be found adequate unless the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said." *Id.* (quoting *Buckley*, 744 A.2d at 305-06). Furthermore, "[o]ur trial courts are invested with broad discretion in crafting jury instructions, and such instructions will be upheld so long as they clearly and accurately present the law to the jury for its consideration." *Simpson*, 66 A.3d at 274. "The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not

require reversal unless the [a]ppellant was prejudiced by that refusal."

***Commonwealth v. Thomas***, 904 A.2d 964, 970 (Pa.Super. 2006).

The certified record does not include any written proposed instruction

from Rush concerning the charges of torture of a police animal and cruelty to

animals. The transcript includes the following statement from Rush's

counsel concerning the court's proposed charge and Rush's desired

alternative:

> [T]he problem with the definition in the current version of
> the charge is that it doesn't include the language that
> malice requires a wickedness of disposition, hardness of
> heart, cruelty, recklessness of consequence and a mind
> regardless of social duty indicating an unjustified disregard
> for a probability of death or great bodily harm. That's
> language [sic] that is part of the definition of malice and
> extreme indifference to the value of, in this case, it would
> be animal life, but that's part of the definition of malice, so
> I'm asking that the jury be instructed. That's based on the
> case law, based on the definition of third degree murder.

N.T., 12/12/14-12/15/14,[8] at 853-54.

The trial court rejected Rush's proposed instruction as an inaccurate

statement of the law:

> the adaptation [was] longer than the instruction. Because
> the statute doesn't require -- what you have here is that
> for animal cruelty or police animals, the act is with malice
> as opposed to maliciously. If the perpetrator's actions
> show this wanton and willful disregard, an unjustified and
> extremely high risk that his conduct would result in death

---

[8] The notes of testimony for December 12, 13, 14, and 15 have been
condensed into one transcript.

- 15 -

or serious bodily injury to the animal. And the statute very clearly doesn't require that.

The statute requires first that the Defendant taunted, tormented, teased, beat, kicked, struck, tortured, mutilated, injured[,] disabled[,] poisoned[,] or killed an animal. It doesn't require extremely high risks of death or serious bodily injury. So that's an inaccurate statement of the law.

*Id.*

Instead, the trial court followed the suggested standard jury instructions:

[Rush] has been charged with one count of animal cruelty involving a police animal. To find [Rush] guilty of this offense, you must find that the following elements have been proven beyond a reasonable doubt: First, that [Rush] taunted, tormented, teased, beat, kicked, struck, tortured, mutilated, injured, disabled, poisoned or killed a police animal.

And second, that [Rush] did so willfully or maliciously. That is, that he did so with the intent to commit and act that he knew the law would forbid or by consciously disregarding a substantial and unjustifiable risk that his conduct would bring about the harm to be prevented.

. . .

[Rush] has been charged with an additional and separate count of animal cruelty. To find [Rush] guilty of this offense, you must find that the following elements have been proven beyond a reasonable doubt: First, that [Rush] killed, maimed, mutilated, disfigured or tortured any dog or cat, whether belonging to himself or another.

And second, that [Rush] did so willfully or maliciously, that is, that he did so even with the intent to commit an act he knew the law would forbid or by consciously disregarding a substantial and unjustifiable risk that his conduct would bring about the harm to be prevented.

N.T., 12/12/14-12/15/14, at 900-02; *see also* Pa. SSJI (Crim) §§ 5511.2, 5511.

The statutes for torture of a police animal and cruelty to animals use the generic terms "willfully" and "maliciously," and do not define either of those terms. Our legislature defines most terms related to a defendant's required mental state at 18 Pa.C.S. § 302. The comment to section 302 explains its purpose as follows:

> The purpose of this section is to clearly define the various mental states upon which criminal liability is to be based. Under existing law the words "wil[l]fully" or "maliciously" are used in many cases. However, these words have no settled meaning. In some instances there is no expressed requirement concerning the existence of mens rea. These defects in existing law are remedied by this section which sets forth and defines the culpability requirements and eliminates the obscurity of the terms "malice" and "wil[l]ful."

18 Pa.C.S. § 302 cmt. (internal citations omitted). As Rush notes, however, while section 302(g) defines "willfully," *see* 18 Pa.C.S. § 302(g) ("A requirement that an offense be committed willfully is satisfied if a person acts knowingly with respect to the material elements of the offense . . . ."), it does not define "maliciously."

Rush claims that the trial court should have used the definition of "malice" derived from *Commonwealth v. Drum*, 58 Pa. 9 (1868). In *Drum*, the Pennsylvania Supreme Court stated that "[m]alice is a legal term, implying much more. It comprehends not only a particular ill-will, but

every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty[.]" ***Id***. at 15.

Rush's requested instruction before the trial court, however, did not merely use the definition of "malice" set forth in ***Drum***. Rush also requested an instruction based on third-degree murder that presumes death. ***See*** N.T., 12/12/14-12/15/14, at 853 ("malice requires a wickedness of disposition, hardness of heart, cruelty, recklessness of consequence and a mind regardless of social duty **indicating an unjustified disregard for a probability of death or great bodily harm**") (emphasis added). We agree with the trial court that the statutes at issue here contain no such requirement and that Rush's proposed instruction was not an accurate statement of the law. ***Id.*** at 855. ***See*** 18 Pa.C.S. § 5511.2(b) ("It shall be unlawful for any person to willfully or maliciously torture, mutilate, injure, disable, poison **or kill** a police animal.") (emphasis added); 18 Pa.C.S. § 5511(a)(2.1)(i)(A) ("willfully and maliciously . . . [k]ills, maims, mutilates, tortures or disfigures any dog"). Thus, it would have been an error for the trial court to accept Rush's modified version of malice. ***See Simpson***, 66 A.3d at 274 (trial courts have "broad discretion in crafting jury instructions,

and such instructions will be upheld so long as they clearly and accurately present the law to the jury").[9]

Accordingly, because Rush's proposed jury instruction was a misstatement of the law, the trial court did not abuse its discretion in rejecting it and instructing the jury according to the Standard Jury Instructions. *Cf. Commonwealth v. Zewe*, 663 A.2d 195, 199 (Pa.Super. 1995) (trial court properly refused to use appellant's proposed instruction where it inaccurately stated the law "and instead relied on an instruction that [wa]s in substantial conformity with the Pennsylvania Suggested Standard Jury Instructions); *Commonwealth v. Strong*, 399 A.2d 88, 92 (no reversible error when trial court refused to read appellant's points for charge when they erroneously stated the applicable law). Thus, we conclude the trial court did not abuse its discretion or commit an error of law.

## III. Discretionary Aspects of Sentencing

Rush next challenges the discretionary aspects of his sentence, arguing that it was "manifestly excessive, unreasonable, and contrary to the

_____

[9] Upon a proper request, trial courts should give a definition of malice consistent with our opinion in *Commonwealth v. Crawford*, 24 A.3d 396 (Pa.Super. 2011). In *Crawford* we explained that "malicious" in the context of 18 Pa.C.S. § 5511(a)(2.1)(i)(A) (cruelty to animals) "is conduct that represents a 'wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty.'" *Id.* at 402 (quoting *Commonwealth v. Ingram*, 926 A.2d 470, 476 (Pa.Super. 2007)).

- 19 -

dictates of the Sentencing Code, and thus an abuse of the sentencing court's discretion." Rush's Br. at 6. "Challenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right." **Commonwealth v. Allen**, 24 A.3d 1058, 1064 (Pa.Super. 2011). Before we address such a challenge, we first determine:

> (1) whether the appeal is timely; (2) whether Appellant preserved his issue; (3) whether Appellant's brief includes a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence; and (4) whether the concise statement raises a substantial question that the sentence is appropriate under the sentencing code.

**Commonwealth v. Austin**, 66 A.3d 798, 808 (Pa.Super. 2013) (quoting **Commonwealth v. Malovich**, 903 A.2d 1247, 1250 (Pa.Super. 2006)).

Rush filed a timely notice of appeal, preserved his claim in a timely post-sentence motion, and included in his brief a concise statement of reasons relied upon for allowance of appeal pursuant to Pennsylvania Rule of Appellate Procedure 2119(f). We must now determine whether he has raised a substantial question that the sentence is inappropriate under the sentencing code and, if so, review the merits.

We evaluate whether a particular sentencing issue raises a substantial question on a case-by-case basis. **Commonwealth v. Dunphy**, 20 A.3d 1215, 1220 (Pa.Super. 2011). A substantial question exists where a defendant raises a "plausible argument that the sentence violates a provision of the sentencing code or is contrary to the fundamental norms of

the sentencing process." ***Commonwealth v. Dodge***, 77 A.3d 1263, 1268 (Pa.Super. 2013) (citation and internal quotation marks omitted). "[A] defendant may raise a substantial question where he receives consecutive sentences within the guideline ranges if . . . application of the guidelines would be clearly unreasonable, resulting in an excessive sentence." ***Id.*** at 1270.

Rush contends that the following sentencing issues present substantial questions: (1) the trial court focused on the seriousness of the crimes and failed to consider his rehabilitative needs; (2) the trial court double-counted factors already considered in the Sentencing Guidelines as the sole reason for imposing a lengthy sentence; (3) the trial court failed to state the guideline ranges at sentencing; and (4) the trial court's stated policy of imposing a sentence for each victim violated the concept of individualized sentencing. Rush has cited no case law holding that his claim that the trial court failed to state the guideline ranges at sentencing raises a substantial question, nor does our research reveal any.[10] His remaining claims,

---

[10] Even if it did raise a substantial question, Rush's claim is meritless. "[G]uidelines have no binding effect . . . they are advisory guideposts that are valuable, may provide an essential starting point, and that must be respected and considered; they recommend, however, rather than require a particular sentence." ***Commonwealth v. Walls***, 926 A.2d 957, 964-65 (Pa. 2007). We have previously held that "[w]hen the record demonstrates that the sentencing court was aware of the guideline ranges and contains no indication that incorrect guideline ranges were applied or that the court misapplied the applicable ranges, we will not reverse merely because the
*(Footnote Continued Next Page)*

however, do raise a substantial question. ***See Commonwealth v. Serrano***, 150 A.3d 470, 473 (Pa.Super. 2016) (finding substantial question where appellant claimed trial court failed to consider his individualized needs); ***Commonwealth v. Coulverson***, 34 A.3d 135, 143 (Pa.Super. 2011) (finding substantial question where appellant argued trial court focused on seriousness of offense and did not consider his rehabilitative needs); ***Commonwealth v. Shugars***, 895 A.2d 1270, 1274-75 (Pa.Super. 2006) (finding substantial question where appellant argued trial court relied on "impermissible factors," including his prior criminal history, as sole reason for his increased sentence). Nevertheless, these claims do not merit relief.

"Sentencing is a matter vested within the discretion of the trial court and will not be disturbed absent a manifest abuse of discretion." ***Commonwealth v. Crump***, 995 A.2d 1280, 1282 (Pa.Super. 2010). "An abuse of discretion requires the trial court to have acted with manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." ***Id.*** "A sentencing court need not undertake a lengthy discourse for its reasons for imposing a sentence or

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

specific ranges were not recited at the sentencing hearing." ***Commonwealth v. Griffin***, 804 A.2d 1, 8 (Pa.Super. 2002).

Here, the sentencing transcript as a whole demonstrates the trial court's awareness of the Sentencing Guidelines. This, coupled with the fact that all of Rush's sentences were within or below the Sentencing Guidelines, indicates that the trial court applied the correct guideline ranges and did not misapply the applicable ranges. Therefore, we find no abuse of discretion.

specifically reference the statute in question, but the record as a whole must reflect the sentencing court's consideration of the facts of the crime and character of the offender." *Id.* at 1283.

Rush first claims that the trial court focused "almost exclusive[ly]" on what happened the night of the crimes and that this demonstrated an improper focus on retribution. Rush's Br. at 55. Rush continues that with regard to the section 9721(b) factors,[11] the trial court focused extensively on "the gravity of the offense as it relates to the impact on the life of the victim and on the community," but failed to adequately consider the "protection of the public," and did not address at all Rush's "rehabilitative needs." 42 Pa.C.S. § 9721(b). Rush further claims that the trial court erred in failing to recite any information contained in the presentence investigation report.

We disagree. The trial court properly considered "the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and [Rush's] rehabilitative needs." 42 Pa.C.S. § 9721(b). At sentencing, the trial court stated it had considered the fact that Rush "was on probation, absconder status, ha[d] not made himself available in the community for supervision, and . . . was being sought by

---

[11] "The sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S. § 9721(b).

police to confirm his Megan's Law registration status." N.T., 3/10/15, at 21.

It further took into consideration Rush's

> history of assaults, and . . . review[ed] the Pre-Sentence Report, somewhere in the neighborhood of about 20, including aggravated assaults, simple assaults, statutory sexual assaults, killing of a police animal, disarming of law enforcement, crimes of violence, and just to be very clear, that does include a few that were withdrawn and a few -- a couple that remain pending by the age of 22.

*Id.* at 22. The trial court continued:

> That is a significant and concerning history of violence, and for that reason, I am going to include in my sentence a rather long tail on a number of counts so that the Parole Board is able to determine when Mr. Rush has demonstrated a level of stability and capacity to return to [the] community and conform his behavior to that which would be expected to be a safe and law abiding citizen.

*Id.*

Additionally, the trial court was aware of Rush's mental health issues. The trial court had before it Rush's pre-sentence report[12] and also heard a statement from Rush's mother, read by the Commonwealth.

> [Rush's mother] wanted the Court to know that her son has had mental health issues throughout his life that she did try to help him with.
>
> She said she doesn't, "sugarcoat" her son. She knows that he is very dangerous. She does want it to be known

---

[12] "Where pre-sentence reports exist, we . . . presume that the sentencing judge was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." ***Commonwealth v. Macias***, 968 A.2d 773, 778 (Pa.Super. 2009) (quoting ***Commonwealth v. Devers***, 546 A.2d 12, 18 (Pa. 1988)).

> that she did try to warn law enforcement about her son's propensity for danger and violence . . .
>
> She indicated to me that she knows that her son must serve a lengthy prison sentence. She's comfortable with that, because he has been institutionalized for most of his life, and she knows at least he will get his medications when he is incarcerated and he will be less likely to do something.
>
> She indicated that she herself is afraid of her son, and that when he would stay with her, she would sleep with her door locked.

*Id.* at 12-13.

As far as Rush's argument that the trial court did not "reiterate[]" specific facts contained in the pre-sentence report, Rush's Br. at 55, he does not cite any authority that requires the trial court to state on the record specific facts included in the pre-sentence report. *See supra* n.12.

Contrary to Rush's claim, the trial court did not merely focus on the events of the night of the crimes; rather, it properly considered all of the evidence before it, including the section 9721(b) factors and all other mitigating circumstances, and adequately stated its reasons on the record. Thus, we find no abuse of discretion.

Next, Rush claims that the trial court erred in twice considering Rush's offense gravity score and prior record score, first in the guidelines calculation and then again when imposing sentence. Rush argues that while a trial court may use a defendant's prior criminal history to supplement other sentencing information, here, Rush's criminal history "was a primary reason for the lengthy sentence imposed." Rush's Br. at 59.

In **Shugars**, we explained that while "[i]t is impermissible for a court to consider factors already included within the sentencing guidelines as the *sole* reason for increasing or decreasing a sentence to the aggravated or mitigated range[,]" a trial court may "use prior conviction history and other factors already included in the guidelines *if, they are used to supplement other extraneous sentencing information*." 895 A.2d at 1275 (quoting **Commonwealth v. Simpson**, 829 A.2d 334, 339 (Pa.Super. 2003)) (emphasis in original).

That the trial court mentioned Rush's prior criminal history in fashioning his sentence does not demonstrate impermissible double-counting of sentencing factors. As discussed above, the trial court considered the section 9721(b) factors, including the impact on the life of the victims, the threat Rush posed to the community, and the facts and circumstances of the crimes. The trial court also considered the pre-sentence report, the fact that Rush was on absconder status, and his lack of successful rehabilitation in the past. Thus, Rush's prior criminal history was not the **sole** factor, "it was merely just one factor among several that led to the increased sentence." **Shugars**, 895 A.2d at 1275.

Finally, Rush claims that the trial court's practice of imposing a separate sentence for each victim is a violation of the concept of individualized sentencing and such a "blanket policy" fails to consider all of the section 9721(b) factors. Rush's Br. at 60.

- 26 -

"Pennsylvania's sentencing system, as evidenced by the Sentencing Code and our case law, is based upon individualized sentencing." ***Walls***, 926 A.2d at 966. However, "[s]entencing is a matter vested within the discretion of the trial court and will not be disturbed absent a manifest abuse of discretion." ***Crump***, 995 A.2d at 1282. Here, the trial court stated that it had a "general philosophy" of sentencing for each victim of a crime. 1925(a) Op. at 20. This statement, however, does not *per se* establish a manifest abuse of its discretion. Where the trial court has considered the section 9721(b) factors, the pre-sentence report, and all of the record evidence, as the trial court did in this case, there is no abuse of discretion. ***See Walls***, 926 A.2d at 966 ("[W]hile the sentencing court unfortunately cast doubt upon the individualized nature of [appellant's] sentence by making certain general comments about those who sexually victimize young children, when viewed as a whole, the sentencing court made a sentencing decision that was individualized with respect to [appellant].").

The trial court stated that

> numerous cases support the principle of consecutive sentences for each victim. ***See Commonwealth v. Watson***, 457 A.2d 127 (Pa.Super. 1983) (although separate sentences for indecent assault and corruption of minors were improper because they related to the same criminal act, the court could properly impose separate sentences with respect to each of two victims); ***Commonwealth v. Lockhart***, 296 A.2d 883 (Pa.Super. 1972) (several victims robbed during same holdup). Furthermore, this Court's general philosophy towards consecutive sentencing to reflect separate crimes committed on separate victims neither precludes argument

as to why such sentences should not be imposed in a particular case nor prevents this Court from imposing a sentence in each case appropriate to the facts of the case and the circumstances of the defendant. This Court imposed sentences in this case based on the facts of this case and the circumstances of this appellant.

1925 Op. at 20. We agree.[13]

Thus, we conclude the trial court did not abuse its discretion in fashioning Rush's sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/11/2017

---

[13] To the extent Rush argues that the trial court abused its discretion by imposing consecutive sentences, this claim is also without merit. The trial court considered the facts of the crimes and Rush's character and circumstances in deciding to impose a consecutive sentence. *See* *Commonwealth v. Prisk*, 13 A.3d 526, 533 (Pa.Super. 2011) ("[T]he sentencing court [has] discretion to impose its sentence concurrently or consecutively to other sentences being imposed at the same time or to sentences already imposed."); *see also Commonwealth v. Hoag*, 665 A.2d 1212, 1214 (Pa.Super. 1995) (stating appellant should not be entitled to "a volume discount for his crimes by having all sentences run concurrently"). We find no abuse of discretion.