J-S19044-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JAMES FRANCIS CALDERONE | : | |
| | : | |
| Appellant | : | No. 1053 MDA 2022 |

Appeal from the PCRA Order Entered July 5, 2022
In the Court of Common Pleas of Columbia County
Criminal Division at No(s): CP-19-CR-0000890-2015

BEFORE: BENDER, P.J.E., McLAUGHLIN, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.: **FILED: APRIL 19, 2024**

James Francis Calderone ("Calderone") appeals from the order denying his first petition for relief filed pursuant to the Post Conviction Relief Act ("PCRA").[1] We affirm.

The PCRA court set forth the following factual and procedural history:

> The present case arises out of an incident which occurred on November 9, 2015[,] during which [Calderone,] with an AK-47[-]type weapon and other firearms and a large cache of ammunition, opened fire at a maintenance worker ([Clair] Hock [("Hock")]) and three [] police officers . . . at a local industrial development complex. [Calderone] drove to the complex with this arsenal prepared in the back of his SUV/[m]ini [v]an. After crashing into a trailer at the complex and exiting his vehicle, [Calderone] popped the back hatch of his vehicle, pulled out one of the weapons he had prepared in the back of his vehicle[,] and began unloading on []Hock and the three police officers[, Officers Brandon Shultz and Regan Rafferty, Detective Gregory Martin,] who quickly responded. In the melee, [one of the officers] was grazed in the head with a metal fragment [resulting from] a bullet

---

[1] *See* 42 Pa.C.S.A. §§ 9541-9546.

shot out of [Calderone's] weapon. The [o]fficers opened fire only after [Calderone] refused to put down his weapons, locked a round in the AK-47 chamber[,] and raised the weapon toward the officers. After exchanging fire, [Calderone] was shot in the chest and incapacitated.

On June 2, 2016, [Calderone] filed a Motion for Leave to Secure a Preliminary Psychiatric/Mental Health Examination . . .[, which the trial court] granted by [o]rder dated June 23, 2016. [Calderone] was examined twice by Richard E. Fischbein, M.D., a board[-]certified psychiatrist, once on May 20, 2017[,] and once on October 12, 2018. Reports of each examination, with various opinions, were entered into the trial record . . ..

Trial occurred from May 8, 2019 to May 10, 2019. During the trial, Dr. Fischbein testified consistent with his reports.

In [his first report], Dr. Fischbein diagnosed [Calderone] with Adjustment Disorder Mixed Emotional Features. Dr. Fischbein testified that [Calderone's] conduct "did not add up," given that he did not have any other violent episodes, as reported by [Calderone]. Dr. Fischbein stated that [Calderone] did not have Anti-Social Personality Disorder. Dr. Fischbein testified that [Calderone] consistently professed to have no memory of the incident. With no objection from the Commonwealth, Dr. Fischbein was permitted to opine that the event was out of character for [Calderone,] and that he believed [Calderone's] reporting . . ..[1]

> [1] Dr. Fischbein testified that the incident was "out of character" for [Calderone], and that [Calderone] "struck me as honest." Dr. Fischbein's testimony included several such statements.

Dr. Fischbein confirmed that, very recently prior to the incident, [Calderone] had found out that he had impregnated his next[-]door neighbor and was concerned about the consequence to his marriage. Dr. Fischbein stated that [Calderone] had alleged that his wife had put Xanax into [his] coffee the morning of the incident, and that Dr. Fischbein believed [Calderone] and his claim that he slipped into a delirium as a result. Dr. Fischbein found [Calderone] to be competent to stand trial, and testified that he was doing rather well in prison, with a balanced outlook. In [that same initial report,] Dr. Fischbein opined that [Calderone's]

psychiatric illness had a "very significant" effect on [Calderone's] behavior during the incident. Dr. Fischbein opined that [Calderone] was "at [a] minimum," guilty but mentally ill, and "wonder[ed]" if [Calderone] lacked intent during the incident.

In [his second report], Dr. Fischbein went beyond his opinions as expressed in [his first report]. Dr. Fischbein interviewed several witnesses and based his opinions on their recounting of events. In [the second report], Dr. Fischbein again opined that [Calderone] was diagnosed with Adjustment Disorder with Mixed Emotional Features, with anxiety and depression. He then opined that, during the incident, [Calderone] "was suffering from a state of delirium, most like[ly] as a result of the surreptitious drugging of his drinks by his wife. . . ." There was some evidence of that at trial, but [Calderone's] wife testified that she did not drug [his] coffee. [Calderon's] wife's testimony was [apparently] accepted as credible by both the jury and by th[e trial] court. . . . [The trial court] found[] that [Calderone's] wife did not spike his coffee with any drug and [accepted] her testimony as credible. Dr. Fischbein opined that [Calderon's] behavior was "out of his volition and control," and that his wife's drugging of his drinks resulted in "involuntarily altering his behavior." Dr. Fischbein continued to be of the opinion that [Calderone] was competent to stand trial, but opined that [Calderone] was not able to appreciate the wrongfulness of his actions and that he was legally insane at the time of the incident.

Dr. Fischbein testified that [Calderone] was not able to form a specific intent to commit the crimes with which he was charged.

On May 10, 2019, a jury convicted [Calderone] of four [] counts of [a]ttempted [m]urder, four [] counts of [a]ggravated [a]ssault [(attempt to cause serious bodily injury)], one [] count of [a]ggravated [a]ssault [(causing bodily injury to a police officer)], and four [] counts of [r]ecklessly [e]ndangering [a]nother [p]erson . . ..

On May 16, 2019, [Calderone] filed a Motion for Leave to Secure a Psychological Evaluation of Defendant for Possible Sentence Mitigation . . .. [The trial court held a] hearing . . . on the . . . motion on June 19, 2019. . ..

\* \* \* \*

- 3 -

Th[e trial c]ourt issued an [o]rder [on] June 19, 2019 denying the . . . [m]otion, except that [the court] ordered [a] risk assessment[, but otherwise reasoned] that further psychiatric evaluations would be redundant.

At the sentencing hearing of July 17, 2019, . . . the sentencing court reviewed the [pre-sentence investigation report ("PSI")]. The [] court also considered the Ohio Risk Assessment System Community Supervision tool. [] Dr. [] Fischbein . . . also testified at the sentencing hearing and elaborated upon the Ohio Risk Assessment System Community Supervision tool. In addition, Dr. Fischbein testified at length regarding [Calderone's] social, psychological, psychiatric[,] and emotional history. Dr. Fischbein's two reports were incorporated into the record at the sentencing hearing.

[Calderone's] social and family histories were supplemented at the sentencing hearing beyond that which was set forth in the PSI. In addition to that, [Calderone's] educational history and employment status were also considered, including a letter from [Calderone's] co-workers. The lack of any prior criminal record was discussed and considered by the sentencing court. The sentencing court held a hearing on the issue of merger of offenses and properly excluded several counts [as] having merged with the attempted murder count.

The entire trial record was incorporated into the sentencing hearing record. [Calderone] was given an opportunity for allocution and declined.

After a full opportunity was provided to [Calderone] and the Commonwealth to present evidence and make argument, the sentencing court expressed the reasons for the sentences pronounced. The sentencing court discussed [Calderone's] deliberate and meticulous assembly of an arsenal of weapons and ammunition, including an AK-47.

At the sentencing hearing, the court expressly considered the testimony of Dr. Fischbein but rejected it as being incredible. The sentencing court "considered the totality of the evidence at trial, and here at sentencing, an[d] [found] no credible evidence of sufficient weight so as to cause [the sentencing court] to mitigate the sentence below the standard range." The Ohio Risk Assessment tool was considered, but the result of that assessment

was found to be incredible due to the fact that it is primarily based upon [Calderone's] self[-]reporting and the inconsistencies of answers and reporting that he provided on different occasions.

The sentencing court determined that [Calderone] alone[] was responsible for his meticulously planned shooting rampage . . ..

* * * *

The sentencing court proceeded to recite the [p]rior [r]ecord [s]core, the [o]ffense [g]ravity [s]core and the [s]tandard [r]ange for each count. The sentence for each count was within the [s]tandard [r]ange. [The court imposed standard-range guideline sentences for each count, with four attempted murder sentences of 96-240 months of imprisonment each, to be served consecutively, along with one consecutive sentence of fifteen to thirty months of incarceration for the aggravated assault (causing bodily injury to a police officer) conviction. The remaining aggravated assault convictions merged for sentencing purposes, and the REAP sentences were to run concurrently.] The aggregate sentence was 399 months (33 years, 3 months) to 990 months (82 years, 6 months) [of imprisonment].

[On September 30, 2020, this Court affirmed the judgment of sentence on direct appeal. *See Commonwealth v. Calderone*, 240 A.3d 995 (Pa. Super. 2020) (unpublished memorandum).[2] Calderone did not petition our Supreme Court for review.] On October 21, 2021, PCRA counsel filed a [timely first petition] for PCRA [r]elief . . ..

PCRA Court Opinion, 7/5/22, at 1-9 (citations to the record omitted). The issues Calderone sought to raise included, *inter alia*, an ineffective assistance of counsel claim regarding his trial attorneys' alleged advice that Calderone should go to trial rather than plead guilty; and ineffectiveness claims arising

---

[2] In his direct appeal, Calderone argued that the sentencing court abused its discretion when denying his motion for the appointment of another psychologist to evaluate him for sentencing purposes.

- 5 -

from trial counsel's decision not to raise on appeal challenges to the sufficiency of the evidence, the trial court's refusal to give an involuntary intoxication jury instruction, and the discretionary aspects of the sentence. **_See generally_** PCRA Petition, 10/13/21, at 12-26.

Following an evidentiary hearing at which Calderone's trial attorneys, first chair Hugh L. Sumner, Esquire and second chair Elizabeth Wood, Esquire; Calderone; and his brother, Michael Calderone, testified, the PCRA court denied relief. **_See_** Order, 7/5/22. Calderone timely appealed. **_See_** Notice of Appeal, 7/25/22. Both Calderone and the PCRA court complied with Pa.R.A.P. 1925.

Calderone raises the following issues for our review:

1. W[ere c]ounsel ineffective in not advising [Calderone] that the involuntary intoxication insanity defense was not recognized in Pennsylvania, especially since [lead counsel Mr. Sumner] thought the sufficiency issue was so poor that that issue was not raised on appeal?

2. Where the lower court did not give an involuntary intoxication instruction but gave a voluntary intoxication instruction, were counsel ineffective in not raising this denial on appeal, where this Court's decision in **_Commonwealth v. Polanco-Cano_**, 2019 WL [3231729] (Pa. Super. 2019) [(unpublished memorandum)], seemingly left open the question whether this defense was viable in Pennsylvania?

3. Where the evidence did not show that [Calderone] attempted to injure anyone but himself and the evidence was insufficient as a matter of law as to the attempted murder and aggravated assault charges, was appellate counsel ineffective for failing to raise a sufficiency of the evidence claim on appeal?

4. Were counsel ineffective for failing to preserve numerous sentencing issues where the lower court violated multiple sentencing norms while imposing a virtual life sentence?

Calderone's Brief at 3 (issues re-ordered).

Our standard of review of an order denying PCRA relief is well-settled:

> Our review of a PCRA court's decision is limited to examining whether the PCRA court's findings of fact are supported by the record, and whether its conclusions of law are free from legal error. We view the record in the light most favorable to the prevailing party in the PCRA court. We are bound by any credibility determinations made by the PCRA court where they are supported by the record. However, we review the PCRA court's legal conclusions *de novo*.

**Commonwealth v. Staton**, 184 A.3d 949, 954 (Pa. 2018) (internal citation and quotations omitted). "Moreover, we must conduct our review in the light most favorable to the prevailing party, in this instance, the Commonwealth." **Commonwealth v. Rizor**, 304 A.3d 1034, 1058 (Pa. 2023) (internal citation omitted). Lastly, the PCRA petitioner "has the burden to persuade this Court that the PCRA court erred and that such error requires relief." **Commonwealth v. Wholaver**, 177 A.3d 136, 144-45 (Pa. 2018) (internal citations omitted).

All of Calderone's issues implicate assertions of ineffective assistance of counsel. In order to be eligible for PCRA relief, the petitioner must prove by a preponderance of the evidence that his conviction or sentence resulted from one or more of the enumerated circumstances found in Section 9543(a)(2), which includes the ineffective assistance of counsel. **See** 42 Pa.C.S.A § 9543(a)(2)(ii); **see also Commonwealth v. Benner**, 147 A.3d 915, 919–20

(Pa. Super. 2016). To prevail on an ineffectiveness claim, the petitioner has the burden to prove: "(1) the underlying substantive claim has arguable merit; (2) counsel whose effectiveness is being challenged did not have a reasonable basis for his or her actions or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's deficient performance." *Benner*, 147 A.3d at 920 (internal citations and quotations omitted). The failure to satisfy any of these prongs is fatal to a petitioner's claim. *See id*. Additionally, counsel is presumed effective. *See id*.

Regarding "arguable merit," this Court has provided that, "[t]he first inquiry in an ineffectiveness claim is always whether the issue/argument/tactic which counsel has foregone and which forms the basis for the assertion of ineffectiveness is of arguable merit; for counsel cannot be considered ineffective for failing to assert a meritless claim." *Commonwealth v. Lott*, 581 A.2d 612, 614 (Pa. Super. 1990) (internal citation and quotations omitted). For the "reasonable basis" prong, the petitioner must show that counsel "had *no* reasonable basis designed to effectuate his client's interests." *Id*. (emphasis added). We will "conclude that counsel's chosen strategy lacked a reasonable basis only if [the petitioner] proves that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." *Commonwealth v. Brown*, 161 A.3d 960, 965 (Pa. Super. 2017) (internal citation omitted). *Accord Commonwealth v. Koehler*, 36 A.3d 121, 132

(Pa. 2012) (stating that, "[g]enerally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests") (internal citations and quotations omitted); *see also Commonwealth v. Johnson*, 289 A.3d 959, 979 (Pa. 2023) (noting that "a claim of ineffectiveness ordinarily will not succeed through comparing, by hindsight, the trial strategy employed with alternatives not pursued") (internal citation and quotations omitted). Lastly, to establish prejudice, the petitioner "must show that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's action or inaction." *Brown*, 161 A.3d at 965.

In his first issue, Calderone asserts ineffective assistance of counsel in connection with his rejection of the Commonwealth's plea offer. Our Supreme Court has recently reiterated the applicable law for cases in which a petitioner alleges ineffective advice led to his rejection of a plea offer:

> In these circumstances a defendant must show [prejudice, *i.e.*,] that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Rizor*, 304 A.3d at 1054 (internal citation omitted).

Calderone argues trial counsel gave him deficient advice. Specifically, Calderone argues he did not have a viable defense, and so there was no way counsel could reasonably advise him to go to trial. *See* Calderone's Brief at 27-28. While Calderone concedes he presented an insanity defense, he argues this defense was "riddled with holes" because some of the evidence—which showed, *inter alia*, that he had engaged in some planning prior to the shooting—undermined the defense. Additionally, Calderone maintains, to the extent his insanity was caused by involuntary intoxication, the law does not recognize an involuntary intoxication defense, which further detracted from the viability of the defense. *See id*. at 27-28. Calderone asserts that, had he known how poor his insanity defense was, he would have pleaded guilty. *See id*. at 31-32.

The PCRA court considered Calderone's issue and determined it merits no relief. The PCRA court determined that lead trial counsel, Mr. Sumner, did not advise Calderone to reject the plea offer and proceed to trial, but that it was Calderone's decision. *See* PCRA Court Opinion, 7/5/22, at 9.

Following our review, we conclude the PCRA court's findings of fact are supported by the record and its legal conclusion error-free. Mr. Sumner, whom the PCRA court deemed credible, testified that he did not advise Calderone to reject the plea, but rather set forth Calderone's options and left the decision up to Calderone. *See* N.T., 4/19/22, at 41. Mr. Sumner informed Calderone that the "defense of insanity is very seldom raised in Pennsylvania.

And, further, it's hardly ever granted." *Id*. at 36. Mr. Sumner further testified that he told Calderone about the plea offer, that it was a "firm offer" of twelve to twenty-four years of imprisonment, and that, "[i]f he took that plea, he could minimize his exposure . . .," but that if he went to trial, there was a "strong likelihood the [j]udge would impose consecutive sentences" for any convictions, up to the more-than-thirty years of incarceration that he actually received. *Id*. at 37. Mr. Sumner agreed that he may have told Calderone an insanity defense was feasible because it was the ultimate conclusion of Dr. Fischbein. *Id*. at 41. According to Mr. Sumner, "when [Calderone] makes up his mind, [he] makes up his mind. . . . [H]e's a man that he would tell you what it is and what he wanted to do." *Id*. at 44-45. Following Calderone's decision to go to trial, trial counsel presented the insanity defense. *See*, *e.g.*, 5/10/19, at 72-74 (Mr. Sumner arguing the jury should believe Dr. Fischbein who opined that Calderone was not guilty by reason of insanity). Moreover, and crucially, *the trial court gave an insanity defense charge to the jury*. *See id*. at 125-33. Additionally, while the trial court informed the jury that *voluntary* intoxication could not establish the insanity defense, *see id*. at 133, and that intoxication "does not by itself, amount to legal insanity," *see id*. at 128, nowhere did the trial court prohibit the jury from considering whether Calderone's alleged *involuntarily* intoxicated state contributed to his asserted insanity. Indeed, the trial court acknowledged Calderone's involuntary intoxication defense. *See id*. at 132 (trial court instructing the

jury that it had "heard evidence and[/]or arguments of two points of view. One, that [Calderone] was involuntarily intoxicated. Specifically, that someone put drugs into his system without his knowledge. That is one line of argument and evidence you heard about"). The trial court also allowed the jury to consider this. **See id**. (trial court stating, "It is up to you to determine what you believe. . . . You can accept [Calderone's] testimony that [he] was involuntarily drugged," and stating that the prohibition on **voluntary** intoxication as a defense did not apply to **involuntary** intoxication).[3] Given that Mr. Sumner: discussed with Calderone the low probability of success of presenting an insanity defense (predicated on involuntary intoxication); explained to Calderone what his exposure would be for the plea as opposed

_____

[3] We acknowledge that, apart from the insanity defense, the issue of involuntary intoxication and whether it is a viable defense appears to be unsettled law. This Court has opined, for example, that "[i]nvoluntary intoxication may, in certain instances, provide a defense to the criminal charge. However, involuntary intoxication cannot, as a matter of law, be established through evidence showing that the criminal defendant was a chronic alcoholic incapable of voluntarily refraining from ingestion of alcohol." **Commonwealth v. Plank**, 478 A.2d 872, 875–76 (Pa. Super. 1984) (emphasis and internal citations and quotations omitted). **But cf**. **Commonwealth v. Griscom**, 600 A.2d 996, 997 (Pa. Super. 1991) (observing that "[w]hile involuntary intoxication may, as an abstract principle, be a defense to a crime, no Pennsylvania appellate court has yet to hold that the defense of involuntary intoxication is a viable one"); **Commonwealth v. Smith**, 831 A.2d 636, 639 (Pa. Super. 2003) (noting that "Pennsylvania[,] like many other jurisdictions, either by statute or caselaw, specifically limits the availability of a voluntary intoxication defense but does not specify whether an involuntary intoxication defense is available"). This does not affect our disposition, however, because Calderone was permitted to put this issue before the jury.

to convictions at trial; and proceeded to trial at Calderone's direction and presented the exact defense they had agreed to present, which the jury nevertheless disbelieved, we cannot say the PCRA court erred in denying Calderone relief based on its conclusion that Calderone failed to show that Mr. Sumner gave Calderone deficient advice which caused him to reject the plea offer and proceed to trial. **See Rizor**, 304 A.3d at 1059 (holding that a PCRA petitioner fails to show prejudice if she cannot show there was a reasonable probability she would have accepted the plea deal where the evidence shows the petitioner was set on going to trial if there was "a chance of winning at trial").

In his second issue, Calderone argues trial counsel were ineffective for failing to raise on appeal the trial court's denial of his request for an involuntary intoxication jury instruction. As noted above, to establish prejudice, the petitioner "must show that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's action or inaction." **Brown**, 161 A.3d at 965. Accordingly, Calderone must establish that but for trial counsel's asserted ineffectiveness, the result of his direct appeal would have differed. **See**, **e.g.**, **Commonwealth v. Lawrence**, 960 A.2d 473, 478 (Pa. Super. 2008) (counsel cannot be ineffective for failing to raise a meritless claim on appeal).

When reviewing a challenge to jury instructions:

> [W]e must review the jury charge as a whole to determine if it is fair and complete. A trial court has wide discretion in

phrasing its jury instructions, and can choose its own words as long as the law is clearly, adequately, and accurately presented to the jury for its consideration. The trial court commits an abuse of discretion only when there is an inaccurate statement of the law.

A jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue. A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions.

*Commonwealth v. Postie*, 200 A.3d 1015, 1026 (Pa. Super. 2018) (internal citation and indentation omitted).

Calderone argues that an involuntary intoxication instruction was critical to his defense, which was based on evidence showing his wife, unbeknownst to him, drugged him, which caused him to open fire on coworkers and police. *See* Calderone's Brief at 33. Calderone asserts that trial counsel advised him to go to trial using this defense and then "abandoned that position by not raising this as an issue on appeal." *Id*. at 35. Calderone maintains that the trial court's refusal to give the requested instruction, in context of the instruction on voluntary intoxication, "could have led the jury to have taken this **omission** as a tacit statement by the lower court that it did not believe that involuntary intoxication was a viable defense and, further[, that] Calderone voluntarily ingested controlled substances." *Id*. at 36 (emphasis in original).

Following our review, we affirm the PCRA court's determination that this issue merits no relief, albeit on different grounds.[4] Calderone's argument is predicated on the fact that the trial court gave no discussion to involuntary intoxication. However, as noted above, this is unsupported by the record. We reproduce the relevant part of the trial court's instruction below:

> . . . I instruct you that intoxication from alcohol or drugs or addiction to alcohol or drugs does not, **by itself**, amount to legal insanity, nor does the combination of intoxication and addiction amount to legal insanity.
>
> * * * *
>
> Now I am going to talk about **voluntary** intoxication or drunk condition. In a sense, I am going to say that this is what we might call a conditional instruction because it is conditioned on what you find. Hear me out on that. You have heard evidence and[/]or arguments of two points of view. One, that [Calderone] was involuntarily intoxicated. Specifically, that someone put drugs into his system without his knowledge. That is one line of argument and evidence you heard about.
>
> You also heard another argument and evidence that [Calderone] had drugs in his system by his own volition, voluntarily. **It is up to you to determine what you believe.** You, as fact[-]finders, have the prerogative of accepting all, part, or none of the evidence. **You can accept [Calderone's] testimony that [he] was involuntarily drugged**. You can choose to reject that testimony and argument and conclude that [he] was voluntarily drugged . . .. **This particular instruction only applies if you conclude that [Calderone] took drugs voluntarily and was not given the drugs without his**

---

[4] The PCRA court concluded that involuntary intoxication was in fact not a viable defense, and, accordingly, this issue would not have been successful on appeal. We do not affirm on this basis. However, this Court may affirm an order denying PCRA relief for any reason appearing of record. **See**, **e.g.**, **Commonwealth v. Towles**, 300 A.3d 400, 417 (Pa. 2023).

> ***knowledge. So here is that instruction applying to voluntary intoxication by drugs.***
>
> A voluntary drugged condition is not a defense to a criminal charge . . ..

N.T., 5/10/19, at 128, 132-33 (emphases added). Thus, the trial court instructed the jury that it could consider the evidence of involuntary intoxication in determining whether to believe Calderone's defense. Additionally, the trial court expressly limited its instruction to state that **voluntary** intoxication is not a defense, which, rather than implying to the jury that involuntary intoxication is not a defense, supports the opposite inference, *i.e.*, that involuntary intoxication **could be** a defense.[5] Thus, Calderone has failed to show that the jury instruction was an error of law or palpably misled the jury, and, accordingly, he cannot establish that the outcome of his appeal would not have been different had trial counsel raised this argument. **See Postie**, 200 A.3d at 1026; **Lawrence**, 960 A.2d at 478. Accordingly, Calderone is due no relief for this issue.

In his third issue, Calderone asserts trial counsel were ineffective for failing to raise sufficiency challenges to his convictions for appeal. As noted above, in order to prove ineffectiveness, a petitioner must show, *inter alia*, prejudice arising from counsel's omission. "As counsel is not deemed to be

---

[5] For purposes of our disposition, we need not decide whether Calderone would have been entitled to this jury instruction or whether involuntary intoxication is a viable defense. We simply note that Calderone received the substance of the instruction he requested, and, therefore, he cannot now assert prejudice.

ineffective for failing to preserve a meritless issue for appellate review," where an issue is meritless, a petitioner "is not entitled to relief . . .." *Commonwealth v. Johnson*, 179 A.3d 1105, 1115 (Pa. Super. 2018) (internal citation omitted). With these principles in mind, we set forth our standard of review for sufficiency claims:

> . . . [W]e evaluate the record in the light most favorable to the verdict[-]winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.
>
> The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, the fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

*Commonwealth v. Franklin*, 69 A.3d 719, 722–23 (Pa. Super. 2013) (internal citations and quotations omitted). Additionally, the fact-finder is free to believe all, part, or none of the evidence. *See Commonwealth v. Greenlee*, 212 A.3d 1038, 1042 (Pa. Super. 2019).

- 17 -

Regarding intent, the Crimes Code defines "criminal attempt" as follows: "A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S.A. § 901(a). As this Court has noted:

> For a defendant to be found guilty of attempted murder, the Commonwealth must establish specific intent to kill. Therefore, if a person takes a substantial step toward the commission of a killing, with the specific intent in mind to commit such an act, he may be convicted of attempted murder. The Commonwealth may establish the *mens rea* required for first-degree murder, [18 Pa.C.S.A. § 2502(a),] specific intent to kill, solely from circumstantial evidence.

***Commonwealth v. Tucker***, 143 A.3d 955, 964 (Pa. Super. 2016) (internal citations, quotations, and brackets omitted). A person commits aggravated assault if he, *inter alia*, "attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]" 18 Pa.C.S.A. § 2702(a)(1). We have explained the elements of aggravated assault as follows:

> "Serious bodily injury" has been defined as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S.A. § 2301. For aggravated assault purposes, an "attempt" is found where an "accused who possesses the required, specific intent acts in a manner which constitutes a substantial step toward perpetrating a serious bodily injury upon another. An intent ordinarily must be proven through circumstantial evidence and inferred from acts, conduct or attendant circumstances.

*Commonwealth v. Fortune*, 68 A.3d 980, 984 (Pa. Super. 2013) (some internal citations and quotations omitted).

Calderone argues that trial counsel were ineffective for preserving sufficiency challenges to his attempted murder and aggravated assault convictions "despite the fact that there was a vigorous insanity defense presented and no evidence of intent to hurt anyone." Calderone's Brief at 18-19. He points to evidence in the record showing that he wanted to die at the time, that he told police after the shooting that he hoped he had not hurt anyone, and that there was testimony he was "shooting high and low, with no rhyme or reason." *Id*. at 19.[6] He additionally relies on his insanity defense to show that, "he did not intend to kill or cause serious bodily injury" because he was involuntarily in a drug-induced state of delirium. *Id*. at 22. Calderone asserts his sufficiency challenges have arguable merit, trial counsel had no reasonable basis for failing to preserve them for appeal, and, had they raised them, his convictions would have been overturned. *See id*. at 23-26.

The PCRA court considered this issue and concluded that, based on the facts of record: "It is clear that the facts were sufficient to sustain the verdicts. It is equally clear that an appeal based upon the claim that the evidence was

---

[6] Calderone concedes he was "quite possibly guilty of assaulting Detective Martin [per section 2702(a)(3)] with a deadly weapon after a shot caused a ricochet and metal str[uck] the officer's head . . .." Calderone's Brief at 19-20. Nor does Calderone contest his recklessly endangering another person ("REAP") convictions. *See id*. at 23. Accordingly, we do not consider his issue to encompass these convictions.

insufficient to support the verdicts would have been frivolous. Trial counsel is not required to preserve and present frivolous grounds for appeal." PCRA Court Opinion, 7/5/22, at 16.

Following our review, we discern no basis to disturb the PCRA court's conclusions. We reiterate that Calderone is challenging his attempted murder and aggravated assault convictions vis-à-vis Hock, Officers Rafferty and Shultz, and Detective Martin. Regarding Hock, the testimony shows that after Calderone yelled to him to "get out[, h]e was having a bad day," Hock got into a golf cart to drive away, "[a]nd it wouldn't start . . .. And, then the next thing I knew, he was shooting at me again." N.T., 5/8/19, at 74-75. Calderone shot multiple rounds at Hock twice while Hock was in the golf cart. *See id*. at 78. Hock could see "dirt flying right in front of me," before he got out of the golf cart; Calderone paused firing, and Hock was able to walk around a building and out of the line of fire. *Id*. at 75. Following the shooting, there was a hole in the windshield that had not previously been there. *See id*. at 75-76.[7] Officer Rafferty testified that, after responding to the shooting, he pleaded with Calderone to stop shooting, but Calderone refused, and ultimately situated himself behind an SUV and then began "shooting from behind the vehicle." *Id*. at 155. During this time, Officer Rafferty saw "Detective Martin, his head recoil violently[,] like back and to the left. And as

---

[7] Hock could not say if he was in the cart when the shot went through the windshield. *See id*. at 79.

- 20 -

he did so[,] back into the left[,] and then he fell to the ground on my left side. . . . [I t]hought he was dead." *Id*. at 155-56. Officer Rafferty described the gunfight as "extremely violent." *Id*. at 156. After releasing a second volley of fire, Officer Rafferty paused, and saw Calderone moving from Rafferty's left to right: "he came out from behind the vehicle and started, it would appear[,] to be beginning to actually flank our position . . .." *Id*. Officer Rafferty described Calderone as having the rifle "shouldered, it would be considered what is port arms or kind of a considered like a low ready position. ***It is a combat position, rifle in his shoulder and moving out.***" *Id*. at 158 (emphasis added). Officer Shultz, who had taken cover behind a tower, recalled that Calderone had "shot through the [SUV] directly towards our direction . . .." *Id*. at 109. Officer Shultz testified: "[The] tower I was standing behind took several direct impacts from those rounds where I had to . . . duck down . . . I don't know if it was pieces of metal, debris, dirt, whatever was coming off that tower from the rounds hitting me . . .." *Id*. at 109-10. According to Officer Shultz, Calderone's "shots were coming directly at us. The only thing we had to do was take cover at that point." *Id*. at 111. Detective Martin testified: "I vividly recall the rounds sailing over top or by my head. There is a different sound from a shot being shot away from me versus being shot towards me." *Id*. at 142. When asked whether Calderone's pattern of fire was random, Detective Martin replied, "Oh, that was directed to fire at . . . the officers' location. That was not random in any way, shape or form.

It was directed at us." ***Id***. During Calderone's subsequent attempt to flank the officers, Officer Rafferty released another volley of approximately twenty rounds, during which he struck Calderone. ***See id***. at 158. Officer Shultz opined of Officer Rafferty's return fire: "Fortunately[,] that saved our lives more than likely." ***Id***. at 111.

In sum, the evidence in the light most favorable to the Commonwealth as the verdict-winner establishes Calderone committed attempted murder and aggravated assault of Hock, Officers Shultz and Rafferty, and Detective Martin: Calderone fired shots toward Hock's head while in the golf cart (evinced by the bullet hole in the windshield of the cart); he caused a head injury to Detective Martin; Officer Shultz testified that Calderone's shots were coming directly at him; Detective Martin recalled shots traveling by his head; Officer Rafferty described Calderone as taking a "combat position" as he fired at them. Based on the above evidence, taken in the light most favorable to the Commonwealth, and with all reasonable inferences drawn therefrom, the evidence was sufficient to prove beyond a reasonable doubt that Calderone fired his assault rifle at Hock, Officers Shultz and Rafferty, and Detective Martin, with the intent to cause serious bodily injury and death. ***See Fortune***, 68 A.3d at 984; ***Commonwealth v. Predmore***, 199 A.3d 925, 931 (Pa. Super. 2018) (*en banc*) (noting that "the use of a deadly weapon ***directed at*** a vital organ of another human being justifies a factual presumption that the actor intended death unless the testimony contains additional evidence that

would demonstrate a contrary intent," but concluding, under the specific circumstance where Predmore had shot the legs of his victim, which are not vital organs, that the presumption was not applicable) (internal citation and quotations omitted; emphasis added).[8] Because counsel cannot be ineffective for failing to preserve a meritless issue, Calderone's assertion of ineffectiveness, based on a failure to preserve sufficiency challenges to his convictions, warrants no relief. **See Johnson**, 179 A.3d at 1115 (counsel cannot be ineffective for failing to preserve a meritless issue).

In his last issue, Calderone argues trial counsel were ineffective for failing to preserve for appeal challenges to the discretionary aspects of his sentence. To succeed on an ineffectiveness claim involving preservation of a discretionary aspects of sentencing issue, a PCRA petitioner must demonstrate that the underlying sentencing issue has merit. **See Commonwealth v. Jones**, 942 A.2d 903, 906 (Pa. Super. 2008) ("[I]f the PCRA court can determine from the record that the sentence was not excessive ... then there is no underlying merit to the ineffectiveness claim and the claim must fail."); **see also Commonwealth v. Reaves**, 923 A.2d 1119, 1131-32 (Pa. 2007) (claim of ineffectiveness for failure to preserve discretionary sentencing issue

---

[8] The jury evidently disbelieved, as it was entitled to, Calderone's insanity defense and credited the testimony evincing his specific intent to kill. **See Greenlee**, 212 A.3d at 1042 (stating that the jury is free to believe all, part, or none of the evidence).

requires a showing of reasonable probability that sentencing court would have imposed lesser sentence).

"Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion." *Commonwealth v. Barnes*, 167 A.3d 110, 122 n.9 (Pa. Super. 2017) (*en banc*). "Where the sentencing court had the benefit of a [PSI], we can assume the sentencing court was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." *Commonwealth v. Hill*, 210 A.3d 1104, 1117 (Pa. Super. 2019) (internal citation and quotations omitted). "Further, where a sentence is within the standard range of the guidelines, Pennsylvania law views the sentence as appropriate under the Sentencing Code." *Id*. (internal citation omitted). A trial court does not abuse its discretion by merely giving a defendant's mitigation evidence less weight than the defendant would like. *See Commonwealth v. Macias*, 968 A.2d 773, 778 (Pa. Super. 2009). A defendant is not entitled to a "'volume discount' because the crimes occurred during one criminal enterprise." *Commonwealth v. Mastromarino*, 2 A.3d 581, 589 (Pa. Super. 2010). Where there are multiple victims resulting from violent criminal offenses, "[t]he mere fact that the crimes arose out of the same incident does not mean that [the defendant] is entitled to receive concurrent sentences." *Commonwealth v. Bonner*, 135 A.3d 592, 605 (Pa. Super. 2016) (internal citation omitted).

Calderone argues his trial attorneys were ineffective for failing to preserve a challenge to the discretionary aspects of his sentence. He relies on the evidence that showed he was "drugged by his wife" at the time. *See* Calderone's Brief at 40. He relies on his lack of prior criminal history and points out "there is no evidence that he would commit [an act like this] in the future." *Id*. at 41. He argues the evidence demonstrates "good character, steady work history, good family support, and, most significantly, there is no evidence he tried to hurt anyone. And this act was truly aberrant conduct." *Id*. Thus, Calderone argues the trial court failed to consider his mitigating evidence and imposed an excessive sentence. *See id*. at 43. He also maintains the trial court "based nearly its entire sentence on the seriousness of the offense" and did not give an adequate rationale for imposing the sentence. *Id*. at 47. He additionally asserts the trial court failed to consider his rehabilitative needs vis-à-vis his mental health issues. *See id*. at 49.

The PCRA court considered this issue and determined it lacks merit because Calderone could not show the trial court abused its discretion:

> At the sentencing hearing . . ., the [PSI] was discussed and defense counsel was given the opportunity to add to or correct it. It was confirmed that the sentencing court reviewed the PSI. The sentencing court also considered the Ohio Risk Assessment System Community Supervision tool. Psychiatrist, Dr. Richard Fischbein, who testified at trial, also testified at the sentencing hearing and elaborated upon the Ohio Risk Assessment System Community Supervision tool. In addition, Dr. Fischbein testified at length regarding the [Calderone's] social, psychological, psychiatric and emotional history. Dr. Fischbein's two reports were incorporated into the record at the sentencing hearing.

[Calderone's] social and family histories were supplemented at the sentencing hearing beyond that which was set forth in the PSI. In addition to that, [Calderone's] educational history and employment status were also considered, including a letter from [Calderone's] co-workers. The lack of any prior criminal record was discussed and considered by the sentencing court. The sentencing court held a hearing on the issue of merger of offenses and properly excluded several counts [as] having merged with the attempted murder count.

The entire trial record was incorporated into the sentencing hearing record. [Calderone] was given an opportunity for allocution and declined.

After a full opportunity was provided to [Calderone] and the Commonwealth to present evidence and make argument, the sentencing court expressed the reasons for the sentences pronounced. The sentencing court discussed [Calderone's] deliberate and meticulous assembly of an arsenal of weapons and ammunition, including an AK-47.

At the sentencing hearing, the court expressly considered the testimony of Dr. Fischbein but rejected it as being incredible. The sentencing court "considered the totality of the evidence at trial, and here at sentencing, an[d] [found] no credible evidence of sufficient weight so as to cause [the sentencing court] to mitigate the sentence below the standard range." The Ohio Risk Assessment tool was considered, but the result of that assessment was found to be incredible due to the fact that it is primarily based upon [Calderone's] self[-]reporting[,] and the inconsistencies of answers and reporting that he provided on different occasions.

The sentencing court determined that [Calderone], and [Calderone] alone, was responsible for his meticulously planned shooting rampage . . ..

* * * *

The sentencing court proceeded to recite the [p]rior [r]ecord [s]core, the [o]ffense [g]ravity [s]core and the [s]tandard [r]ange for each count. The sentence for each count was within the [s]tandard [r]ange.

* * * *

In addition, in ordering the Ohio Risk Assessment, the sentencing court obviously focused upon [Calderone's] amenability to rehabilitation. That is the prime focus of a risk assessment: To determine the risk of recidivism. . . . The fact that [the court] found the conclusions of the [r]isk [a]ssessment incredible in this case does not negate the fact that [the court] ordered its completion and considered it. . . ..

* * * *

In the present case, [Calderone] was convicted of attempting to murder four [] persons, including three [] police officers and one [] co-worker. [Calderone] was sentence[ed] consecutively for these four [] convictions, plus the [a]ggravated [a]ssault upon a police officer . . .. The sentencing court chose to sentence [Calderone] concurrently for the four [] [REAP] counts. [Calderone] should not get a "volume discount" on this case . . .. [Calderone] was convicted of trying to kill four [] persons and for causing shrapnel to hit a police officer in the head, and justice requires that he serve a separate, consecutive sentence for each of those counts.

* * * *

. . . [T]he sentencing court elaborated at length as to the reasons for the sentences. The PSI was discussed, as was [Calderone's] and his expert psychiatrist's claims to a lack of need for rehabilitation due to the incident being "out of character." The fact that th[e] court found those claims to be incredible does not mean that they were not considered. Incapacitation was cited as a primary reason for the sentences: It was expressly stated that the public must be protected from someone, such as [Calderone], who has the capacity within [himself] to assemble an arsenal in the back of [his] SUV, to drive it to work and to unload multiple clips from an automatic assault style weapon on several police officers and a co[-]worker.

* * * *

It is reiterated that the need for incapacitation, deterrence, and punishment was determined to outweigh [Calderone's] need for rehabilitation. Again, the determination that the need for incapacitation outweighs [Calderone's] amenability to

rehabilitation does not mean that [Calderone's] amenability to rehabilitation was ignored. It means that the sentencing court indeed engaged in a balancing of the purposes of sentencing and that the sentencing court made a determination of that balance against [Calderone].

PCRA Court Opinion, 7/5/22, at 5-9, 12-13, 14-16 (internal citations to the record omitted).

Following our review, we conclude Calderone has failed to show the PCRA court abused its discretion or committed an error of law. The PCRA court's lengthy and thoughtful recapitulation of the sentencing hearing demonstrates the sentencing court thoroughly considered the circumstances of this case as well as Calderone's mitigation evidence and rehabilitative needs; therefore, the outcome of his direct appeal would not have differed had trial counsel preserved challenges to the discretionary aspects of his sentence.[9] We note the sentencing court considered Calderone's PSI and therefore was presumptively aware of Calderone's character and rehabilitative needs. *See* N.T., 7/17/19, at 2 (sentencing court indicating it reviewed the PSI); *see also Hill*, 210 A.3d at 1117. Additionally, the sentencing court reviewed two psychiatric reports and a risk assessment, though it did not

---

[9] An assertion that a sentencing court imposed an excessive sentence and failed to consider a defendant's mitigating evidence or rehabilitative needs raises a substantial question, as does an assertion that the sentencing court failed to adequately state its reasons for the sentence. *See*, *e.g.*, *Commonwealth v. Rush*, 162 A.3d 530, 543-44 (Pa. Super. 2017) (stating that an assertion that the trial court also failed to consider, among other things, a defendant's rehabilitative needs, and thereby imposed an unreasonable and excessive sentence, presents a substantial question).

afford them the weight Calderone desired. **See** N.T., 7/17/19, at 21 (court discussing Calderone's expert reports and risk assessments); **see also Macias**, 968 A.2d at 778 (sentencing court does not abuse its discretion by giving less weight to mitigation evidence than a defendant prefers). Calderone's consecutive sentences were all in the standard range, which is presumptively appropriate. **See Hill**, 210 A.3d at 1117. Additionally, the consecutive sentences for attempted murder were because Calderone attempted to kill four different people; and the one consecutive sentence for an aggravated assault (causing bodily injury to a police officer) conviction, that did not merge with the attempted murder convictions, was because Calderone succeeded in causing bodily injury to Detective Martin. **See** N.T., 7/17/19, at 26; **see also Bonner**, 135 A.3d at 605 (defendants are not entitled to a volume discount where there are multiple victims of criminal conduct even if it occurred during the same incident). The sentencing court spent considerable time articulating its reasoning. **See** N.T., 7/17/19, at 19-28. The foregoing shows Calderone has failed to show prejudice, *i.e.*, that the outcome of his appeal would have been different had trial counsel preserved challenges to the discretionary aspects of his sentence. Because counsel cannot be ineffective for failing to preserve a meritless claim, Calderone is due no relief. **See Jones**, 942 A.2d at 906; **see also Reaves**, 923 A.2d at 1131-32. Accordingly, we affirm the PCRA court's order denying relief.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 04/19/2024