J-S03027-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MARKEZ ANGER | : | |
| | : | |
| Appellant | : | No. 107 WDA 2024 |

Appeal from the Judgment of Sentence Entered September 13, 2023
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0004628-2022

BEFORE: KUNSELMAN, J., SULLIVAN, J., and BECK, J.

MEMORANDUM BY SULLIVAN, J.:         **FILED: MAY 15, 2025**

Markez Anger ("Anger") appeals from the judgment of sentence following his convictions for, *inter alia*, first-degree murder, criminal conspiracy (homicide), criminal attempt (homicide), and carrying a firearm without a license.[1] We affirm.

Anger's convictions arise from his participation in a drive-by shooting, during which his co-defendant, Londell Falconer, Jr. ("Falconer") served as the driver of a vehicle from which the passenger fired twelve rounds into another vehicle, in an attempt to shoot a teenager therein ("H.N."). Instead, the shooter struck an infant passenger ("D.T.") several times, killing him.[2] The

---

[1] *See* 18 Pa.C.S.A. § 2502(a), 903(a), 901(a), 6106(a)(1).

[2] Falconer appealed from his judgment of sentence; his case is pending at *Commonwealth v. Falconer*, No. 18 WDA 2024 (J-S03026-25).

factual and procedural history of this case is largely uncontested in this appeal. Anger's appeal hinges on challenges to the weight and sufficiency of the evidence of his identity as the shooter, as well as the discretionary aspects of his sentence.

The trial court summarized the factual and procedural history in further detail, which we set forth below in relevant part:

> On May 29, 2022, Tylajae Allen [("Allen")] drove a Jeep Wrangler . . . to PPG Plaza on Fourth Avenue located in downtown Pittsburgh. Also inside the vehicle were front seat passenger H.N., and rear seat passengers Deashea Green [("Green")] and her 18-month-old son[,] D.T. They arrived around 2:45 p.m. D.T., who was buckled into a child safety seat, remained in the vehicle with H.N. while Green and Allen went inside to inquire about renting a penthouse for Allen's 21st birthday. Minutes later, while H.N. was turned facing D.T., he heard gunshots. H.N. ducked down without seeing the suspect vehicle or actors. When he felt it was safe, H.N. fled from the vehicle, leaving D.T. inside.
>
> The subsequent police investigation uncovered surveillance footage from various street and building cameras that showed a Jeep Compass . . . turn onto Fourth Avenue from Stanwix Street. As it approached the Wrangler now occupied only by H.N. and D.T., the Compass slowed down and maneuvered close to the Wrangler. The front seat passenger of the Compass then propped himself out the window and positioned the top part of his body over the roof while facing the rear of the vehicle. The individual then fired multiple shots in the direction of the Wrangler before he tucked back inside the Compass as it fled the scene. A total of twelve 9-millimeter cartridge casings were recovered from the scene along with multiple bullet fragments. It was later determined that the recovered casings fired from the same weapon, and that many of the bullets struck and/or entered the Wrangler. D.T. suffered multiple gunshots to the head which caused his death. H.N. did not suffer any injuries.
>
> Police identified the suspect vehicle from this footage, allowing them to trace its movements before, during, and after

the shooting, through numerous surveillance cameras. This footage was shown at trial through a compilation video.

Beginning at 2:05 p.m., the Compass left the parking area of Allegheny Commons, a housing complex in the Northside section of Pittsburgh. From there it entered an I-279 on ramp towards downtown Pittsburgh. Around this same time a white Chevy Tahoe[, owned by Anger's mother,] turned onto Fourth Avenue where the Wrangler is parked and circled around the block returning to Stanwix Street. While the Tahoe was stopped in the left lane at a red light, the Compass pulled up alongside the Tahoe in the right lane. The Tahoe reversed slightly[,] and the Compass turned left in front of the Tahoe while making a U-turn on Stanwix Street. The Tahoe followed behind the Compass, where they then parted ways at 2:47 p.m. as the Compass turned onto Fourth Avenue and the Tahoe continued straight on Stanwix.

***As detailed above, when the Compass approached the Wrangler, the front seat passenger appeared out the window and fired several rounds at the parked car. The videos show the shooter is dressed in a black hooded sweatshirt and light-colored tan pants.*** During the flight, surveillance cameras captured the driver, who is wearing a white shirt. From this same footage, there appeared to be paint damage to the roof of the Compass.

***At 2:51 p.m., approximately five minutes after the shooting,*** the white Tahoe arrived at Allegheny Commons. Minutes later, the ***Compass*** arrived at the same location and the occupants exited. Consistent with footage captured during the flight, the driver is dressed in a white shirt as well as light-colored pants and shoes. ***The passenger exited wearing a black-hooded sweatshirt, tan pants, and dark shoes with white soles.*** The two individuals walked towards the building in a casual gait and appear relaxed. Approximately ten minutes later, both individuals reemerged from the housing complex. The driver reentered the Compass and exited the parking lot. The male wearing the black hooded sweatshirt remained in the area. ***At 3:38 p.m. the white Tahoe was captured exiting the Allegheny Commons parking area and traveling to a gas station down the road. Additional footage from the gas station[, i.e., 7-Eleven,] captured two males exit the Tahoe; one of the males is wearing tan pants, a white undershirt, and dark shoes with white soles.***

Detective Kevin Hodges [("Detective Hodges")] of the City of Pittsburgh Violence Prevention and Intelligence Unit testified that he is very familiar with Allegheny Commons and the people who live at and/or frequent the complex. Detective Hodges explained that as a former Zone 1 patrol officer and in the capacity of a detective, he has conducted hours of surveillance of this area. This includes first-person surveillance, viewing photographs, as well as monitoring social media related to people in this area. Accordingly, investigators requested Detective Hodges to review the footage from the gas station in hopes that he may recognize any of the suspected individuals. ***Detective Hodges identified the male in the white tank top, tan pants, and dark shoes with white soles as [Anger]. He explained that despite having never had any face-to-face interactions with [Anger], he was able to identify him based on his build, face, and the tattoo located above his eye.***

Around 5:00 p.m. on May 29, 2022, Mark Azen [("Azen")], a resident of the Troy Hill section of Pittsburgh, heard a commotion while unloading groceries from his car on Tinsbury Street. He saw a dark colored vehicle park behind another vehicle, almost hitting it. Thereafter, he saw two black males dressed in white clothing exit the car and run in the direction of an alleyway near a Uni-Mart located on Lowrie Street. Azen approached the vehicle and observed that it was unoccupied and lacked license plates. [While looking inside to see if the vehicle was unoccupied, he touched it and left a fingerprint on it.] Azen called 911 to report what he had witnessed.[3]

Around this same time, Michael Scopel [("Scopel")], who was working as a driver for Uber, answered a request for a ride from the Uni-Mart located on Lowrie Street in Troy Hill. Scopel testified that the customer was a young black male with a very stocky build named Londell[, *i.e.*, Falconer]. [Falconer] asked to be dropped off at a bank near Allegheny Commons. Surveillance

_____

[3] Azen is occasionally mistakenly referenced as "Azur," but there is no doubt that the references are intended to denote Azen. ***See***, ***e.g.***, N.T., 6/5-7/23, at 128 (testimony by a Commonwealth witness referencing Azen by "Azur"); ***see also*** Anger's Br. at 19 (quoting the aforementioned testimony indicating "Mr. Azur"). ***Cf***. ***id***. at 180 (testimony that Azen left a print on the exterior passenger window of the Compass).

footage from the bank corroborated Scopel's testimony. Utilizing this video at trial, Scopel identified both his vehicle and the male who he gave a ride to who identified himself as Londell.

Detective Paul Becker [("Detective Becker")] with the Crime Scene Investigation Unit of the Pittsburgh Police Department was one of several officers who had been assisting in processing the crime scene from the shooting that occurred on Fourth Avenue. He was then called to Tinsbury Street in response to Azen's 911 call as police suspected that the vehicle was involved in the drive-by shooting. The vehicle, a black Jeep Compass, was positioned as described by Azen; parked up against another vehicle and without a license plate. There was visible damage to the bracket area indicating that both the plate and bracket had been ripped from the frame. Police searched the immediate area, including the alleyway where Azen saw the two men flee. Here, they located a garbage can that contained two bent Illinois license plates and brackets along with a cardboard box containing Red Bull cans, t-shirts, and a Nyquil box. The items were processed for fingerprints. City of Pittsburgh Police Detective John Godlewski [("Detective Godlewski")], an expert in [l]atent [f]ingerprints, testified that Falconer's fingerprints were found on one of the Red Bull cans and a license plate. The Illinois license plate was a match to the suspect vehicle which was later determined to be a rental car. The vehicle had been rented from May 9, 2022 through May 31, 2022 to ["]Dana Jackson.["] A subsequent records search found no such person with that name, date of birth, and address, as provided in the rental agreement.

The Compass was towed from the scene where it was later processed. A thorough examination of the car revealed ballistic damage to the rooftop. Specifically, two bullet strikes to the roof and a bullet hole in the driver's side luggage rack. The ballistic damage all had the same trajectory running from the passenger side to the driver's side. Additionally, latent prints were found on the passenger side of the vehicle positioned such that the palm was on the roof with the fingers pointing down towards the windshield. ***The ridge detail of the fingerprint on the windshield was matched to [Anger].*** Additional fingerprints were found on the exterior panel and window of the front passenger door. The fingerprint located on the panel lacked sufficient detail to allow for identification, and the exterior window print was determined to be [] Azen's. The roofline was also

swabbed for DNA, but due to an insufficient detectable quantity, comparisons could not be made to either [Anger] or Falconer.

The Wrangler was also processed for evidence and unsurprisingly, sustained significant ballistic damage. The bullet entries and strikes traveled from either the passenger side to the driver's side or from the front to the rear of the vehicle, with a downward trajectory. From the interior, police recovered a .45 caliber casing beneath the front seat, a 9 mm pistol, over $200, and 10 bricks and 2 bundles of heroin/fentanyl mix.

On May 30, 2022[,] an arrest warrant was issued for [Anger,] and on June 5, 2022, the Fugitive Task Force located him at a residence in Turtle Creek. During a search of this residence, police seized a Glock 9mm pistol and a ghost gun. A ghost gun is comprised of different body and frame parts and does not have a serial number.

All three firearms seized during the investigation: the 9mm from the Wrangler; and the 9mm and ghost gun from the Turtle Creek residence; were found to be operable with no ballistic match to the twelve[]9 mm cartridge casings recovered from the crime scene on Fourth Avenue. The two firearms recovered from the Turtle Creek residence were also submitted for further forensic testing. Both weapons were swabbed for DNA, however the results were uninterpretable, and no comparison was able to be made to either [Anger] or Falconer.

Detective Becker, an expert in shooting reconstruction, opined that the body measurements obtained from [Anger] conform with the body type of the shooter. He explained that [Anger]'s build and size was capable of fitting out the passenger window, and his height, plus or minus five inches, is consistent with the trajectory and angle of the bullets fired from the moving Compass into the Wrangler. Relevant to the [firearms convictions], the parties stipulated that [Anger] did not have a gun licensure permit. Additionally, the Commonwealth provided a certified conviction that [Anger] has a 2014 juvenile adjudication for the crime of [r]obbery . . ..

Following his arrest on May 30, 2022, Falconer was interviewed at police headquarters by Detective Robert Shaw. . . . Falconer [eventually] admit[ed] that he drove the Compass involved in the May 29, 2022 shooting. However, he did

not identify the front seat passenger, repeatedly maintaining that he did not know the person. On June 5, 2022, Detective Shaw also conducted an interview of [Anger]. When asked about his whereabouts at the time of the murder, [Anger] responded that he wasn't there and that he did not do it.

[At a non-jury trial in which the court heard the evidence described above, and i]n his defense, [Anger] called Detective Shaw who testified that [Anger]'s mother, Donniesha Bush, is the registered owner of the white Tahoe captured in surveillance footage that was played at trial. . . ..

\* \* \* \*

[Anger] was found guilty of [the aforementioned offenses].

. . . On September 13, 2023, the [c]ourt imposed a mandatory life sentence [for f]irst-[d]egree [m]urder[;] fifteen (15) to thirty (30) years of incarceration [for c]riminal [c]onspiracy ([h]omicide [(D.T.)])[;] five (5) to ten (10) years [for c]riminal [a]ttempt ([h]omicide [(H.N.)])[;] two and a half (2 ½) to five (5) years [for carrying a firearm without a license,] resulting in an aggregate sentence of life imprisonment followed by a consecutive sentence of twenty-two and a half (22 ½) to forty-five (45) years [of imprisonment].

Trial Ct. Op., 3/28/24, at 2-16 (footnotes and citations to the record omitted; emphases added; some paragraphs re-ordered for clarity). Following the denial of post-sentence motions in December 2023, Anger timely appealed in January 2024, and both he and the trial court complied with Pa.R.A.P. 1925.

Anger raises the following issues for our review:

1. Whether the evidence was insufficient to support the verdict of guilty as to any of the charged offenses?

2. Whether the verdict was against the weight of the evidence to convict [] Anger of any of the charged offenses?

3. Whether the trial court abused its discretion in sentencing [] Anger?

Anger's Br. at 3 (issues re-ordered for ease of disposition).

In his first issue, Anger challenges the sufficiency of the evidence supporting his convictions. Our standard of review for sufficiency challenges is as follows:

> As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.
>
> The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, the fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the convictions will be upheld.

*Commonwealth v. Franklin*, 69 A.3d 719, 722–23 (Pa. Super. 2013) (internal citations, quotations, and brackets omitted).

Anger challenges the sufficiency of the evidence establishing his identity as the shooter. This Court has explained that:

> In addition to proving the statutory elements of the crimes charged beyond a reasonable doubt, the Commonwealth must

also establish the identity of the defendant as the perpetrator of the crimes. Evidence of identification need not be positive and certain to sustain a conviction.

Our Supreme Court has stated that "any indefiniteness and uncertainty in the identification testimony goes to its weight. Direct evidence of identity is, of course, not necessary and a defendant may be convicted solely on circumstantial evidence." *Commonwealth v. Hickman*, 309 A.2d 564, 566 ([Pa.] 1973) (citations omitted).

*Commonwealth v. Strafford*, 194 A.3d 168, 175–76 (Pa. Super. 2018) (some internal citations and quotations omitted). Additionally, "absence of evidence is not evidence of absence," therefore, the absence of direct evidence, such as DNA, does not preclude a conviction based wholly on circumstantial evidence. *See*, *e.g.*, *Commonwealth v. Heilman*, 867 A.2d 542, 547 (Pa. Super. 2005).

In his challenge to the sufficiency of the evidence establishing his identity as the shooter, Anger argues the Commonwealth presented no direct evidence of his identity. *See* Anger's Br. at 16. He argues the firearm from the shooting and the shooter's black hoodie were never recovered, and there is an absence of DNA linking him to the Compass. *See id*. He further asserts he was seen only in the Tahoe, not the Compass, and he was only identified at the 7-Eleven nearly an hour later. *See id*.

The trial court considered Anger's arguments and concluded the evidence was sufficient to prove beyond a reasonable doubt his identity as the shooter:

After a thorough review of the record in the present case, the [c]ourt finds that the facts presented at trial were more than sufficient to conclude that [Anger] fired the fatal shots that took the young life of D.T.

As detailed above, the police investigation produced a significant amount of surveillance footage that showed the movements and actions of those involved leading up to, during, and after this ambush style shooting. The gunman is seen exiting the Compass at Allegheny Commons within five minutes of the shooting. It was apparent to the [c]ourt, as the fact finder, that the person has the same hair, gait, body type, and skin color of the person from the 7-Eleven surveillance footage who Detective Hodges positively identified as [Anger]. This identification was unchallenged at trial. The only difference being that in the 7-Eleven footage[, Anger] was no longer wearing a black hooded sweatshirt. Otherwise, he was dressed in light tan pants and dark shoes with white soles as worn by the shooter upon exiting the Compass five minutes after the shooting.

Additionally, fingerprint evidence connected [Anger] to the vehicle used in the commission of the homicide. This forensic evidence was insufficient according to [Anger] because a portion of a print was smudged, and it was not established how long it had been on the vehicle. This argument is unpersuasive for several reasons. First, the location of the fingerprint. The video of the shooting clearly shows the front passenger pull himself out the corresponding window and position his upper body over the rooftop of the Compass. The fingerprint attributable to [Anger] is positioned with the palm on the roof and the fingers pointing down onto the front windshield, similar to how the gunman was situated while discharging the weapon. Second, although [Anger] states a print was smudged, that was not the condition of the print matched to [him]. Latent print expert Detective Godlewski testified that a print recovered from the front windshield contained adequate ridge detail to allow for a conclusive match to [Anger]. Third, an inability to prove the timing of the fingerprint is not dispositive, nor does it call into question this corroborating piece of evidence. When the vehicle was seized on May 29, 2022, it was approximately three weeks into the rental period and would have been exposed to the outdoor elements during that time. As explained by the [c]ourt, it was satisfied that the fingerprint, which contained ridge details necessary to make a match to

[Anger], had been put on the Compass close in time to when it was seized and subsequently processed on June 6, 2022.

Accordingly, the Commonwealth's evidence was sufficient to establish [Anger] was the gunman on May 29, 2022. . . ..

Trial Ct. Op., 3/28/24, at 20-22.

Following our review, we conclude the evidence in the light most favorable to the Commonwealth was sufficient to support a finding beyond a reasonable doubt that Anger was the person who shot D.T. Specifically, we note Anger's fingerprint was on the windshield of the Compass in the vicinity of where the shooter placed his hand when he shot D.T. *See* N.T., 6/5-7/23, at 178-80. Additionally, Detective Hodges's identification of Anger at the 7-Eleven showed him wearing the same clothes the shooter wore when exiting the Compass, apart from the black hoodie. *See id*. at 184-86. Given Detective Hodges's identification of Anger coming out of the vehicle that had driven in concert with the Compass; Anger, in the surveillance video had the same "hair, gait, body type, and skin color," along with the same light tan pants and dark shoes with white soles, as the shooter exiting the Compass; and Anger's fingerprint was on the Compass in the same spot as the shooter's, we, like the trial court, conclude the evidence was sufficient to prove beyond a reasonable doubt Anger's identity as the shooter. As this Court has previously held, the lack of additional evidence, such as DNA or the murder weapon, is not evidence of absence. *Cf*. *Heilman*, 867 A.2d at 547.

Anger next asserts the trial court's finding that he was the shooter was against the weight of the evidence. This Court's standard of review is as follows:

> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court[.]

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

***Commonwealth v. Juray***, 275 A.3d 1037, 1047 (Pa. Super. 2022) (internal citation and indentation omitted). "Relief on a weight of the evidence claim is reserved for extraordinary circumstances, when the [fact-finder's] verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." ***Commonwealth v. Sanchez***, 36 A.3d 24, 39 (Pa. 2011) (internal citation and quotations omitted).

Anger argues that Detective Becker testified that Anger could have fit through the window of the Compass; yet, by Becker's testimony, the shooter could have been five inches taller or shorter than Anger and still have fit through the window; accordingly, the court put too much emphasis on

- 12 -

Detective Becker's testimony regarding the size of the shooter. *See* Anger's Br. at 17-18. Anger additionally argues the trial court put too little weight on his connection to the Tahoe, namely that his mother owned the Taho and that he was seen exiting the Tahoe after the shooting. *See id*. at 18-19. He reasons that given his "connection to the Tahoe and the fact that he was seen in it shortly after the shooting, it is far more likely he was in this vehicle than in the . . . Compass at the time of the shooting." *See id*. at 19. Anger also points to the lack of motive evidence, and argues some of the fingerprints on the vehicle were from the witness Azen. *See id*.

The trial court considered Anger's arguments and concluded the finding that he was the shooter was not against the weight of the evidence:

> [Anger's] statement alleges that the court gave too much weight to the testimony of Detective [] Becker. Specifically, his testimony that [Anger's] body measurements are consistent with that of the shooter within five (5) inches. The record simply does not support this claim. The court did not ask any questions of the witness regarding this testimony that would suggest how it weighed this testimony. Nor did the court mention this portion of Detective Becker's testimony at the time it rendered its verdict, when highlighting evidence it found critical to the identification of [Anger].

> [Anger's] remaining assertion relates to his claim that the court did not properly weigh what he deems exculpatory evidence: [his] connection to the white Tahoe, a failure by the Commonwealth to present a motive, and the existence of a palm print on the Compass that was not attributable to [Anger].

> [Anger] correctly states that motive is not an element of a crime and therefore, there is no burden on the Commonwealth to establish motive. Although [Anger] raises this within a weight claim, an argument about a lack of evidence is properly raised as a sufficiency claim. Consequently, this argument regarding motive

- 13 -

is meritless both in how it was raised and in its effort to assign error on the court for failing to properly "weigh" a lack of motive.

Lastly, [Anger] maintains that a palm print found on the exterior front passenger window and [his] connection to the white Tahoe collectively raise a question as to the weight of the Commonwealth's evidence. As to the palm print, [Anger's] argument fails to address that that palm print was identified as belonging to [] Azen[, who] was a Commonwealth witness who testified that he called 911 and touched the Compass after observing Falconer flee from the car. There was no argument at trial that Azen was a participant in the crime or that his print came to be on the vehicle by any means other than how he testified. Regarding the Tahoe, [Anger] maintains two things. First, that the Tahoe is "completely unrelated to the shooting," and second, that the Commonwealth's evidence only demonstrated that he was in the Tahoe on May 29, 2022. Although [Anger] was observed in the Tahoe after the shooting, that does not foreclose [his] presence in the Compass at the time of the shooting or outweigh the fingerprint and video evidence that the Court deemed critical in establishing his identity as the shooter. Contrary to [Anger's] claim, the white Tahoe was not "unrelated" to this crime, as it appeared to act in concert with the Compass in surveying the area and engaging with [Anger] and Falconer immediately preceding the shooting. The registration of the Tahoe to [Anger's] mother provides additional connection between [him] and the crime when considered along with the other evidence presented at trial.

In conclusion, the court had an opportunity to fairly assess the credibility of all the witnesses and evidence, including video surveillance that tracked [Anger's] movements before, during, and after the homicide. It is important to reiterate that [Anger] did not dispute the majority of the Commonwealth's evidence, only that it did not establish his identity. As stated above, the fact[]finder is free to believe, all, some, or none of the evidence.

Trial Ct. Op., 3/28/24, at 33-36 (unnecessary capitalization and citations to the record omitted).

Following our review, we determine Anger has failed to show the trial court abused its discretion in concluding Anger's weight claim warrants no

relief. Initially, the Compass from which Anger fired into the Wrangler was seen driving in concert with his mother's Tahoe ; therefore, Anger's connection to the Tahoe further establishes the Tahoe's, and his, relation to the shooting. Additionally, there was no dispute that Azen was a witness nor that he touched the vehicle and left a fingerprint on the vehicle;[4] these points were uncontested, and there is no other evidence linking Azen to the shooting. Lastly, the trial court, sitting as the finder of fact, indicated it did not rely on Detective Becker's testimony, but, rather, the other evidence of record establishing Anger's identity as the shooter, notwithstanding his motive was unknown. Based on the foregoing, we cannot conclude the trial court abused its discretion in denying Anger's weight claim, as Anger failed to show the verdict shocks one's sense of justice such that a new trial is imperative. *See Sanchez*, 36 A.3d at 39.

Lastly, Anger next challenges the discretionary aspects of his sentence. This Court has explained:

> [C]hallenges to the discretionary aspects of sentencing do not entitle an appellant to an appeal as of right. Prior to reaching the merits of a discretionary sentencing issue:
>
> [W]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal[;] (2) whether the issue was properly preserved at sentencing or in a motion to

---

[4] *See*, *e.g.*, N.T., 6/5-7/23, at 73 (Azen testifying, "I would say I went to the front and to the passenger side. I might have touched the vehicle . . . when I went up to it because I was trying to see if someone else was inside the vehicle"); *see also id*. at 128, 180 (testimony that Azen left a fingerprint on the Compass).

- 15 -

reconsider and modify sentence[;] (3) whether appellant's brief has a fatal defect[;] and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code[.]

*Commonwealth v. Perzel*, 291 A.3d 38, 46 (Pa. Super. 2023) (internal citations omitted).

Our review discloses that Anger timely appealed from his judgment of sentence; he included a challenge to the discretionary aspects of his sentence in his post-sentence motion, *see* Amended Post-Sentence Mot., 10/27/23, at ¶ 8(c). Additionally, he included a Rule 2119(f) statement in his brief. *See* Anger's Br. at 12. Lastly, Anger's assertion, *i.e.*, that the trial court focused only on the seriousness of the offense and imposed a manifestly excessive sentence, raises a substantial question. *See* Anger's Br. at 13-14; *see also Commonwealth v. Derrickson*, 242 A.3d 667, 680 (Pa. Super. 2020). Accordingly, we proceed to review the merits of Anger's sentencing challenge.

Our standard of review is as follows:

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Derrickson*, 242 A.3d at 680.

Further, this Court's review of the discretionary aspects of a sentence is governed by 42 Pa.C.S.A. §§ 9781(c) and (d). Section 9781(c) reads:

- 16 -

(c) **Determination on appeal.**—The appellate court shall vacate the sentence and remand the case to the sentencing court with instructions if it finds:

(1) the sentencing court purported to sentence within the sentencing guidelines but applied the guidelines erroneously;

(2) the sentencing court sentenced within the sentencing guidelines but the case involves circumstances where the application of the guidelines would be clearly unreasonable; or

(3) the sentencing court sentenced outside the sentencing guidelines and the sentence is unreasonable.

In all other cases the appellate court shall affirm the sentence imposed by the sentencing court.

42 Pa.C.S.A. § 9781(c). Subsection 9781(d) requires that in reviewing the record, we consider:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant.

(2) The opportunity of the sentencing court to observe the defendant, including any presentence investigation.

(3) The findings upon which the sentence was based.

(4) The guidelines promulgated by the commission.

42 Pa.C.S.A. § 9781(d). The balancing of the sentencing factors is the sole province of the sentencing court, which has the opportunity to observe the defendant and all witnesses firsthand; this Court cannot reweigh sentencing factors and impose judgment in place of the sentencing court where that court was fully aware of all mitigating factors. *See Commonwealth v. Lawrence*, 313 A.3d 265, 286 (Pa. Super. 2024).

Relevant here: "Generally, Pennsylvania law affords the sentencing court discretion to impose its sentence concurrently or consecutively to other sentences being imposed at the same time or to sentences already imposed. An appellant is not entitled to a volume discount on his multiple convictions by the imposition of concurrent sentences." *Id*. (internal citation, quotations, and brackets omitted). *Accord Commonwealth v. Brown*, 249 A.3d 1206, 1216 (Pa. Super. 2021) (stating the same).

Lastly, when imposing a sentence:

the sentencing court must consider the factors set out in 42 Pa.C.S.[A.] § 9721(b), including the protection of the public, the gravity of the offense in relation to the impact on the victim and [the] community, and the] rehabilitative needs of the defendant. Additionally, the trial court must consider the sentencing guidelines. Where a [presentence investigation] report [("PSI")] exists, this Court will presume that the sentencing judge was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors.

*Lawrence*, 313 A.3d at 286 (brackets and some internal citations and quotations omitted).

Anger argues the trial court abused its discretion at sentencing by failing to reference statutory factors apart from the seriousness of the offense and imposed an excessive sentence by running the sentences for his conspiracy to commit homicide which resulted in D.T.'s death, attempted murder of H.N., and firearms convictions consecutively. *See* Anger's Br. at 22. Anger argues the court failed to refer specifically to him or his history, characteristics, or rehabilitative needs. *See id*. at 23. Anger acknowledges the court possessed

the PSI but maintains the presumption that the court considered it should be considered rebutted by the trial court's statements wherein it failed to articulate anything other than a focus on the nature of the crimes. *See id*. at 24.

The trial court considered Anger's arguments and concluded they merit no relief:

> The immense impact of this crime was presented to the court through impact statements by D.T.'s mother, godfather, and paternal grandmother. During the sentencing hearing[, Anger] expressed remorse to the families of the victims. However, he used the majority of his allocution to discuss his personal hardships and dissatisfaction with his trial counsel. In light of the mandatory sentence of life imprisonment without the possibility of parole for the death of D.T., no mitigation or rehabilitative needs were discussed or offered by counsel.
>
> . . . Pursuant to 42 Pa.C.S.A. § 9721, the court has discretion to impose sentences consecutively or concurrently.
>
> Here, the record is unambiguous that the court considered all the sentencing factors set forth in 42 Pa.C.S.[A.] § 9721(b). The court reviewed the [PSI] and the sentencing guidelines, which were placed on the record and in fact corrected upon the court identifying an error.
>
> After consideration of all factors and information received, a sentence at only count 1 - first-degree murder, would have inadequately reflected the brazen and reckless act that took place on the afternoon of May 29, 2022 in downtown Pittsburgh. D.T. was the unfortunate and tragic victim of [Anger's] coordinated effort with Falconer to take the life of H.N. To impose a sentence that did not reflect the true intention of [Anger's] conduct would not address the nature and gravity of the offenses. The sentence of life imprisonment plus twenty-two and a half (22 1/2) to forty-five (45) years was not an abuse of discretion.

Trial Ct. Op., 3/28/24, at 40-41 (citations to the record and unnecessary capitalization omitted).

Following our review, we conclude Anger's challenges to the discretionary aspects of his sentence are meritless. The record reveals the following: Anger opted to present no information or evidence at sentencing apart from a brief allocution in which he generally expressed remorse and then spent the remainder of complaining about his attorney. *See* N.T., 9/13/23, at 14-16. Additionally, the trial court expressly considered Anger's PSI—and accordingly the court presumptively considered Anger's mitigating information, *see Commonwealth v. Rush*, 162 A.3d 530, 543 n.10 (Pa. Super. 2017)—along with victim impact statements, and explained that in light of these circumstances, anything other than consecutive sentences would fail to reflect the seriousness of Anger's daylight public attack on H.N. in downtown Pittsburgh, which resulted in the death of one of the "most defenseless of our citizens[.]" *Id*. at 23. This evinces the trial court's consideration of the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and the community, consistent with section 9721(b); and, as noted above, the court presumptively considered Anger's rehabilitative needs. Additionally, the trial court's decision to run some of Anger's sentences consecutively rather than concurrently does not rise to the level of abuse of discretion. *See Lawrence*, 313 A.3d at 286. Moreover, Anger is not entitled to a volume discount for his criminal

convictions. *See Brown*, 249 A.3d at 1216. For the foregoing reasons, Anger's challenges to the discretionary aspects of his sentence merit no relief.

Judgment of sentence affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 5/15/2025